

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---

### NO. AP-77,021

---

### NAIM RASOOL MUHAMMAD, Appellant

### v.

### THE STATE OF TEXAS

---

### ON DIRECT APPEAL FROM CAUSE NO. F11-00698-K IN THE CRIMINAL DISTRICT COURT NO. 4 DALLAS COUNTY

---

ALCALA, J., delivered the opinion of the Court, in which KELLER, P.J., MEYERS, KEASLER, HERVEY, RICHARDSON, YEARY, and NEWELL, JJ., joined. JOHNSON, J., concurred.

## O P I N I O N

Appellant was convicted in May 2013 of capital murder committed in August 2011. TEX. PENAL CODE § 19.03(a)(7). Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the

trial judge sentenced appellant to death. TEX. CODE CRIM. PROC. art. 37.071, § 2(g).[1]

Direct appeal to this Court is automatic. Appellant raises fifty-four points of error. After

reviewing appellant's points of error, we find them to be without merit. Consequently,

we affirm the trial court's judgment and sentence of death.

STATEMENT OF FACTS

Appellant drowned two of his sons, five-year-old Naim Muhammad and three-

year-old Elijah Muhammad, because he was angry with their mother, Kametra Sampson,

who had separated from appellant about eight months before the offense. Because the

circumstances of the instant offense are intertwined with appellant's long history of

abusing Kametra, we will begin with this history.

Appellant and Kametra met and began dating in 2003, when Kametra was fifteen

years old and appellant was twenty-five. Within a few weeks, appellant began physically

abusing Kametra. The first episode of abuse occurred during an argument in the back

yard of appellant's father's house. Kametra told appellant that she was leaving and

turned to walk away. Appellant grabbed her, threw her into his car, punched her

repeatedly, and told her that she was not leaving. He did not let her go home that day.

Appellant beat Kametra once or twice a week for the first four or five years of

their relationship, and then the beatings became more frequent. Appellant usually abused

Kametra by punching her in the face with his fists. In 2006, Kametra told appellant that

---

[1] Unless otherwise indicated, all future references to Articles refer to the Texas Code of Criminal Procedure.

she was pregnant. Appellant told her to get an abortion, and when she refused, he attempted to induce a miscarriage by punching and kicking her stomach. When that failed, appellant urged Kametra to drink bleach or use a wire hanger, but Kametra did not do so. Kametra later gave birth to the couple's first child, Naim. In 2008, Kametra informed appellant that she was pregnant with their second child. She again refused to get an abortion and appellant again attempted to induce a miscarriage by punching and kicking her stomach. The attempt failed, and Kametra gave birth to Elijah. Appellant did not punch and kick Kametra in the stomach when she informed him that she was pregnant with their third child, Jeremiah, but appellant continued to physically abuse her by punching her in the face.

Around Christmas of 2010, Kametra left appellant, taking their three sons with her. Appellant continued to physically abuse Kametra when he had the opportunity. He also used their sons in his efforts to control her. For example, on February 24, 2011, appellant showed up at Kametra's mother's house, and Kametra went outside to talk to him. He told Kametra that he wanted to take Naim and Elijah, but Kametra told him that he could not. She went back inside and tried to close the door, but appellant forced his way into the house. He pushed Kametra against the wall and punched her in the face. He then rushed into the dining room and grabbed Naim. While carrying Naim, he kicked down a side door and fled. Police found Naim a short time later and returned him to Kametra.

As a result of this incident, appellant was arrested for assaulting Kametra. Appellant was already on probation for a 2009 assault on his sister, and the State

subsequently filed a motion to revoke his probation based on this new offense. However, the motion to revoke remained pending because appellant stopped reporting to his probation officer and avoided contact with other law-enforcement officials.

Kametra and appellant continued to communicate after the February 2011 incident, and the boys sometimes visited appellant. Appellant repeatedly asked Kametra to reconcile with him, but she rejected his requests. On March 24, 2011, all three boys visited appellant at his brother's house. Appellant told Kametra that he could not take Naim to preschool that day, so Kametra borrowed a car from her sister, Gabrielle, and drove to the house to pick up the boys. Kametra stopped the car in front of the house, loaded the children into the back seat, and sat down in the driver's seat. Appellant, who was standing by the car, asked Kametra to take him to the store. She told him that she could not do that because she had to return the car to Gabrielle. Appellant climbed into the car anyway. Kametra again told appellant that she could not take him to the store and asked him to get out of the car. Appellant became upset and choked Kametra into unconsciousness.

When Kametra regained consciousness, she and the boys were inside the house. Appellant hit Kametra in the head with a heavy object when she told him that she needed to leave. Kametra finally persuaded appellant to let her go, telling him that Gabrielle would call the police if she did not return the car soon. Appellant allowed Kametra to leave with the boys, but he insisted on riding with them.

Gabrielle was waiting outside when they stopped the car. As Kametra exited the

car, Gabrielle saw her battered condition and called the police. Appellant picked up Elijah and told Kametra, who was holding Jeremiah, that he would kill Elijah if she did not walk away with him. Appellant walked away quickly, carrying Elijah. Kametra, still carrying Jeremiah, followed appellant slowly because she did not want to go with him. Appellant attempted to hide when police officers arrived, but when he realized that the officers had seen him, he dropped Elijah and ran away.

By the time of the instant offense, a Child Protective Services ("CPS") worker had instructed Kametra not to let appellant visit the boys unless his mother accompanied him. Kametra complied with this instruction. Nevertheless, at around 6:30 a.m. on Naim's first day of kindergarten, appellant borrowed a friend's car and showed up at Kametra's house, unannounced and alone. He stated that he wanted to take Naim to school. Kametra and her mother told appellant to leave several times before he complied.

A short time later, while Kametra and Elijah were walking Naim to school, appellant pulled up in a car in front of them, jumped out, and picked up a rock. He threatened to hit Kametra in the head with it if she and the boys did not get into the car with him. After they were in the car, appellant drove toward Naim's school, but he passed it without stopping and announced that Naim would not go to school that day. Appellant drove erratically while he threatened and hit Kametra. His demeanor alternated between hostile and affectionate. He told Kametra several times that he would kill her and the boys.

When appellant stopped the car at a traffic light, Kametra saw a constable's car in

the next lane.  She jumped out of appellant's car and ran to the constable for help.  Although the light was still red and another car was stopped in front of him, appellant drove the car over the curb and sped away with the boys.  He told them that their mother did not care about them any more.  He stopped the car near a creek and walked the boys down the embankment.  The boys told appellant that they loved him, and Naim asked him not to kill them.

Having second thoughts, appellant walked the boys back up to the car and smoked a cigarette while he considered his next move.  He concluded that he could not take the boys back to the house because the police would be waiting for them.  After deciding to complete his plan, appellant walked the boys back down the embankment.  Appellant carried Elijah after Elijah complained that he could not walk down by himself.  Elijah cried for his mother, and appellant told the boys that she ran away and he did not know where she was.  Naim repeated, "I love you, dad," over and over.

Appellant told the boys to sit down in the water, turn away from him, and pretend they were swimming.  They complied, and he held their heads under water.  Naim was kicking, but appellant would not let him get up.  Appellant did not let up until both boys stopped moving.  Appellant left their bodies in the creek and drove to Kametra's house, where he broke a window in the room where Jeremiah was sleeping.  Appellant attempted to climb through the window, but Kametra's brother entered the room and pushed appellant back outside.  Appellant, as he was leaving, stated, "Your nephews are dead now."

After he committed the offense, appellant evaded capture and resisted arrest. Appellant told his mother, who was waiting for him at his brother's house, that he would not go home because he knew the police were looking for him and he did not want to go back to jail. While law-enforcement officers searched for him, appellant abandoned the car and fled on foot. He kicked and fought with the arresting officers when they found him. Five or six officers struggled to restrain him, and they "Tazed" him three times before they were finally able to handcuff him. Appellant did not stop fighting until he was handcuffed.

After the offense but before his capture, appellant's mother asked appellant what he had done to her grandsons. Appellant told her that he "didn't do that" and that Kametra "did it" by refusing to let him see them. After he was captured, appellant said in his statement to police that he regretted what he had done and that the only reason he killed the boys was to prove a point to Kametra. He stated that he would not have done it if she had stayed with him in the car. Following his statement, appellant asked the investigating officer to tell Kametra that it was her fault that he killed the boys because he would not have done it if she had let him see them. He also asked the investigator to tell his sisters that he was sorry he "did this stupid-ass shit."

While in jail, appellant wrote a letter to Kametra's mother in which he stated that he would never do anything to hurt the boys. He declared that he still loved Kametra. He also stated that the boys' deaths were Kametra's fault because she got out of the car, and Kametra's mother's fault because she did not let appellant into her house.

SUFFICIENCY OF THE EVIDENCE

In point of error forty-two, appellant asserts that the evidence is legally insufficient to support the jury's affirmative finding of future dangerousness. Appellant argues that he had "no prior violent offense convictions that sent him to the penitentiary" and that defense witnesses testified that he was a low risk for future dangerousness. He asserts that the evidence showed that his conduct in this case was the result of a "family conflict" about his children. Appellant reasons that, because this type of conflict would not exist in prison, he would not be a future danger if he received a life sentence. Appellant also points to evidence of his terrible childhood and his low cognitive functioning to explain his criminal behavior.

When reviewing the sufficiency of the evidence supporting the jury's future-dangerousness determination, we view the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. *See Martinez v. State,* 327 S.W.3d 727, 730 (Tex. Crim. App. 2010); *see also Wardrip v. State,* 56 S.W.3d 588, 593 (Tex. Crim. App. 2001). We do not weigh the evidence of future dangerousness against countervailing evidence. *See Brooks v. State,* 323 S.W.3d 893, 894 (Tex. Crim. App. 2010) ("a reviewing court is required to defer to a jury's credibility and weight determinations"); *see also McGinn v. State,* 961 S.W.2d 161, 168-69 (Tex. Crim. App. 1998) (stating that, once the rationality

of the future-dangerousness prediction is established, it is impossible to determine whether the prediction is nevertheless wrong or unjust because of countervailing evidence).

In determining the special issues, the jury is entitled to consider all of the evidence presented at both the guilt and punishment stages of trial. Art. 37.071, § 2(d)(1); *see also Young v. State,* 283 S.W.3d 854, 863 (Tex. Crim. App. 2009). The jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society. *Wardrip,* 56 S.W.3d at 594 & n.7; *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

The circumstances of an offense alone, if severe enough, can be sufficient to sustain an affirmative finding as to a defendant's future dangerousness. *See Rosales v. State,* 841 S.W.2d 368, 381 (Tex. Crim. App. 1992); *see also Kunkle v. State,* 771 S.W.2d 435, 445-46 (Tex. Crim. App. 1986). "This Court has repeatedly said that, if the circumstances of the case are sufficiently cold-blooded or calculated, then those facts alone may support a finding of future dangerousness." *Gardner v. State,* 306 S.W.3d 274, 304 (Tex. Crim. App. 2009).

The evidence that appellant intentionally drowned his two young sons in order to "prove a point to" their mother supports the jury's finding of future dangerousness. The age and helplessness of the victims provide some evidence of appellant's future dangerousness. *See*, *e.g.*, *Lucio v. State,* 351 S.W.3d 878, 904 (Tex. Crim. App. 2011) (noting that "evidence reflecting that appellant brutally murdered her defenseless

two-year-old child" supported future-dangerousness finding); *Heiselbetz v. State,* 906 S.W.2d 500, 507 (Tex. Crim. App. 1995) (citing "the murder of a mother and her helpless child" as evidence of future dangerousness). So is the act of killing children for the purpose of hurting their mother. *See*, *e.g.*, *Williams v. State,* 273 S.W.3d 200, 220 (Tex. Crim. App. 2008) (stating that, to the extent that the defendant's knowledge of the victim's relationships enabled him to reasonably foresee the harmful effects of the victim's death on others, the jury could consider that information with respect to the defendant's future dangerousness); *Hathorn v. State,* 848 S.W.2d 101, 115 (Tex. Crim. App. 1992) (describing appellant's threats to kill witness's and prosecutor's children as evidence of future dangerousness).

Further, the evidence that appellant walked his sons down a creek bank intending to drown them, smoked a cigarette while he reconsidered, decided to complete his plan, and walked them down to the creek a second time supports a finding of calculation and deliberation. *Cf. Devoe v. State,* 354 S.W.3d 457, 461 (Tex. Crim. App. 2011). Similarly, the close physical contact and sustained effort required to drown two conscious victims evinces appellant's future dangerousness. *Cf. Martinez v. State,* 924 S.W.2d 693, 696-97 (Tex. Crim. App. 1996) (distinguishing a killing by the distant and quick use of a gun from a killing by the use of a knife, which requires close proximity and contact with the victim; "such a personal act requires a wanton and callous disregard for human life").

Appellant's history of abusing the victims' mother is also evidence of future dangerousness. *Cf. Lucio,* 351 S.W.3d at 903 (indicating that evidence that appellant had

a long history of abusing capital-murder victim supported future-dangerousness finding);

*see also Coble v. State,* 330 S.W.3d 253, 265 (Tex. Crim. App. 2010) (indicating that,

after appellant was convicted of killing his wife's family, appellant's life-long history of

violence toward women supported a future-dangerousness finding); *Heiselbetz,* 906

S.W.2d at 507 (citing "appellant's history of committing violent acts against women,

children, and the elderly" as evidence of future dangerousness).  Evidence that appellant

assaulted Kametra while on probation for assaulting his sister and that revocation

proceedings were pending when he committed the instant offense also support the jury's

future-dangerousness finding.  *See*, *e.g., Barnes v. State,* 876 S.W.2d 316, 329 (Tex.

Crim. App. 1994) ("That appellant committed another crime while already on probation

for other offenses has a bearing on the question of whether he would pose a future danger

to society.").

Further, appellant's lack of remorse and his deflection of blame support the jury's

future-dangerousness finding.  *See, e.g., Salazar v. State,* 38 S.W.3d 141, 145 (Tex. Crim.

App. 2001); *see also Dewberry v. State,* 4 S.W.3d 735, 743 (Tex. Crim. App. 1999)

("Future dangerousness may be supported in part by evidence of a lack of remorse or

contrition.").

In addition to the circumstances of the offense, other evidence, such as prior bad

acts, prior criminal record, psychiatric evidence, and character evidence, may support a

finding of future dangerousness.  *See Guevara v. State,* 97 S.W.3d 579, 581 (Tex. Crim.

App. 2003).  In this case, the prosecutor presented evidence that appellant's criminal

history spanned nearly twenty years. *See Garcia v. State,* 57 S.W.3d 436, 441-42 (Tex. Crim. App. 2001). Appellant had contact with the juvenile system before he was a teenager, and, when he was thirteen years old, he began committing criminal offenses that resulted in juvenile adjudications. Among other offenses, appellant was adjudicated for evading arrest and for burglaries of habitations and vehicles. When he was fifteen years old, appellant was sent to a juvenile home where he received individual and group counseling. After numerous rules infractions, however, including assaulting the same juvenile twice in one day, appellant was discharged from the home and sent to the Texas Youth Commission facility for Jefferson County ("TYC") in July 1995.

At TYC, appellant was often explosive and disrespectful to staff. He was particularly hostile to female staff. On one occasion when he was being disciplined for disruptive behavior, appellant looked toward a female officer and declared that he wanted to "beat somebody down," adding, "especially females." Appellant also committed rules infractions. For example, when he was found in possession of razor blades and crushed aspirin in December 1995, he admitted to staff that he stole the razor blades and crushed the aspirin to trade it for snacks. In September 1996, he was disciplined after he repeatedly punched a juvenile while another boy held the victim down. After appellant was released from TYC, he resumed committing criminal offenses such as burglary and evading arrest.

Appellant's history of violence toward women was not limited to Kametra. In 2001, appellant threatened to beat a female neighbor after she saw him looking in her

bathroom window and confronted him in her yard. He left when she called the police.

In 2009, appellant hit his sister in the head with a hammer. When officers responded to the scene, his sister was crying, and fresh blood was running down the back of her head. Appellant had walked down the street to a convenience store after the incident. When he was brought back to the scene, he told officers that he had acted in self-defense. This incident was not the first time appellant had hit his sister. As a result of this incident, appellant pleaded guilty to a charge of aggravated assault with a deadly weapon and received five years' deferred adjudication. He did not comply with many of the conditions of his probation, including attending an anger-management course, performing community service, and obtaining a job. He also tested positive for drug use on several occasions. Appellant stopped reporting to his probation officer after his arrest for assaulting Kametra.

While in jail awaiting trial on the instant offense, appellant committed violent disciplinary offenses. For example, he refused instructions to return a breakfast tray and "swung at" the officer who entered his cell to retrieve it. On another occasion, appellant fought with an inmate over the choice of a television show.

Finally, one of appellant's expert witnesses opined that appellant had antisocial personality disorder ("ASPD"), although she minimized the significance of ASPD with respect to predicting future dangerousness in the prison setting. *Cf. Lucio,* 351 S.W.3d at 904 (observing that the future-dangerousness special issue asks a jury to determine whether a capital defendant would constitute a continuing threat to society "whether in or

out of prison"). Viewed in the light most favorable to the verdict, the evidence –

including the circumstances and facts of the offense and appellant's history of criminal

offenses and bad acts – was such that the jury could find beyond a reasonable doubt that

appellant would be a continuing threat to society. Point of error forty-two is overruled.

JURY VOIR DIRE

In points of error one through seventeen, appellant asserts that the trial court

erroneously denied his challenges for cause to seventeen prospective jurors. Appellant

was entitled to fifteen peremptory challenges to be used against prospective jurors. *See*

Art. 35.15(a). After he exhausted his fifteen peremptory strikes, he received two

additional strikes. The trial court denied appellant's request for a third additional strike to

exercise on prospective juror Ernest Hand, and Hand was seated as the twelfth juror.

Appellant identified Hand as an objectionable juror. Because appellant received two

additional peremptory strikes, he is not entitled to relief unless he establishes that the trial

court erroneously denied at least three of his challenges for cause. *See Saldano v. State,*

232 S.W.3d 77, 93 (Tex. Crim. App. 2007).

A prospective juror is challengeable for cause if he or she has a bias or prejudice

against the defendant or against the law upon which either the State or the defense is

entitled to rely. Art. 35.16(a)(9) & (c)(2); *Gardner,* 306 S.W.3d at 295. The test is

whether the prospective juror's bias or prejudice would substantially impair his ability to

carry out his duties in accordance with his instructions and his oath. *Wainwright v. Witt,*

469 U.S. 412, 424 (1985). This standard does not require that bias be proved with

"unmistakable clarity" because many prospective jurors simply cannot be asked enough questions to reach the point at which their bias has been made "unmistakably clear." *Id.*

When a party wishes to exclude a juror because of bias, it is the party seeking exclusion who must demonstrate, through questioning, that the prospective juror lacks impartiality. *Witt,* 469 U.S. at 423. To establish that a challenge for cause is proper, the proponent of the challenge must show that the prospective juror understood the requirements of the law and could not overcome his prejudice well enough to follow the law. *Davis v. State,* 329 S.W.3d 798, 807 (Tex. Crim. App. 2010). Before a prospective juror may be excused for cause on this basis, the law must be explained to him, and he must be asked whether he can follow that law, regardless of his personal views. *Feldman v. State,* 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

The standard of review on appeal is whether the trial court abused its discretion by overruling a challenge for cause. *Smith v. State,* 297 S.W.3d 260, 268 (Tex. Crim. App. 2009). In making this decision, we examine the voir dire of the prospective juror as a whole and determine whether the record shows that the prospective juror's convictions would interfere with his ability to serve as a juror and to abide by the oath. *Curry v. State,* 910 S.W.2d 490, 493 (Tex. Crim. App. 1989); *see also Feldman,* 71 S.W.3d at 744. We afford great deference to the trial court's decision because the trial judge is present to observe the demeanor of prospective jurors and to listen to tones of voice. *See Morgan v. Illinois,* 504 U.S. 719, 734-39 (1992); *Davis,* 329 S.W.3d at 807. Particular deference is due when the prospective juror's answers are vacillating, unclear, or contradictory.

*Smith,* 297 S.W.3d at 268.

In point of error two, appellant asserts that the trial court erroneously overruled his challenge for cause against prospective juror Georgia Nichols. He argues that Nichols was disqualified because she would not require the State to prove appellant's guilt beyond a reasonable doubt.[2]

The record does not support appellant's claim that Nichols would not hold the State to its burden of proof at the guilt-or-innocence phase. When the prosecutor broached the subject of the State's burden of proof, Nichols sought clarification about the meaning of "proof beyond a reasonable doubt." She explained that she had previously served on a jury in a criminal case and that she was unhappy with the result. She felt that she had let the other jurors talk her into voting not guilty by persuading her that her determination of guilt was based on improper inferences from the evidence. Nichols stated that she wanted clarification because she would never "be one-hundred percent sure" or know the facts of the offense "beyond a shadow of a doubt" unless she witnessed them personally. The prosecutor explained the State's burden of proof and assured Nichols that "beyond a reasonable doubt" did not mean "beyond a shadow of a doubt." Nichols indicated that she understood. When questioned by defense counsel, Nichols provided an accurate understanding of the State's burden of proof and affirmed that she

---

[2] With respect to Nichols and many other prospective jurors, appellant asserts on appeal grounds for disqualification that he failed to raise at trial. We will not address these grounds because he failed to preserve error. *See* TEX. R. APP. P. 33.1.

would hold the State to its burden. The court did not abuse its discretion by denying the challenge for cause. Point of error two is overruled.

In point of error three, appellant asserts that the trial court erroneously denied his challenge for cause against Dee Jay Earley. He argues that Earley was disqualified because Earley: (1) was deceptive when he failed to indicate on his questionnaire that he had been a victim's advocate for two and one-half years while in the military; and (2) would not consider evidence of voluntary intoxication to be mitigating.

Appellant's first argument is predicated on the following facts in the record. Question 58 on the jury questionnaire asked prospective jurors, "Have you ever worked with any local, state or national citizen's law enforcement group, or a group dedicated to victim's rights?" As illustrative examples, the question identified Mothers Against Drunk Driving ("MADD"), the police auxiliary, or the sheriff auxiliary. A space below the question was provided for the prospective juror to list any such associations. Earley answered this question in the negative and did not list any associations. During voir dire, however, Earley disclosed that he had volunteered for a victim's advocacy program while he was in the military. Specifically, the prosecutor asked Earley if he had participated in the military judicial process, and Earley responded:

> Ma'am, I spent a small amount of time as a victims' advocate while I was in the service, but as far as court; no, ma'am.
>
> Q. Okay. And what did you do as a victim advocate?
>
> A. My job was to go help the victims, no matter what it be, civilian or otherwise, on the post. For example, a battered spouse, putting her up in a

hotel on the post for the night.

Q. Okay.

A. Getting with RMP's or military police to ensure that there's anything other – the restraining orders to keep him or her away from the victim –

Q. Okay.

A. – or alleged victim at that time.

Q. Anything about that that you feel that we need to know or –

A. No, ma'am. Soldiers will be soldiers.

Q. Yeah.

A. They get in scraps pretty often.

Defense counsel asked Earley for additional details about his experience as a victim's advocate:

Q. Was that something – was that a post you were assigned to?

A. No, sir. That's a complete volunteer service that some soldiers in the military do.

Q. Okay. And so that was while you were serving; is that correct?

A. Yes, sir.

Q. Kind of what were your – tell me about it, please.

A. My commander at the time asked me if I'd be interested in doing it. In the military, fights between spouses, fights between other soldiers happen quite frequently.

Q. Yes, sir.

A. I mean, it's a volatile area to be.

My commander had asked me if I'd be interested in doing it. I done it. I went to – I forget how many hours worth of classes. And then the – basically the MPs would call us out if there was a – a wife that beat a husband or a husband that beat a wife, child abuse, or just a teenage kid filing a complaint against their mother or father.

Q. Yes, sir.

A. And our jobs basically were to go out and help do what we could.

Now, obviously, we're not a legal group of people. We are merely volunteers that have been trained to deal with personal situations and give them somebody to talk to, help them find a room for the night, if need be, help them find food for the night, if need be.

Q. And how long did you do that, Mr. Earley?

A. Off and on for about two-and-a-half years, sir.

Q. Okay. So a little bit more than half of your service then, correct?

A. Yes, sir.

* * *

Q. Anything about that two-and-a-half year service as a victim advocate in the military, any of that kind of maybe even raised your level of support for the death penalty or anything like that?

A. No, sir.

* * *

Q. Okay. And anything about that advocacy program, Mr. Earley, that has you maybe more likely to give the State the benefit of the doubt regarding any particular aspects of this case?

A. No, sir.

Defense counsel later challenged Earley for cause on the ground that he had been

deceptive when he failed to list his experience as a victim's advocate on the questionnaire. The State pointed out that Earley's volunteer work was not, as stated in Question Number 58, a "local, state or national citizen's law enforcement group, or a group dedicated to victim's rights." The trial court indicated that the groups listed as examples under the question were not necessarily similar to Earley's volunteer program in the military.

The trial court brought Earley back into the courtroom. The court provided Earley with his questionnaire and asked him to review Question Number 58. Earley did so and then explained that he did not think that his volunteer work was covered by the question. He stated that his work had been "completely voluntary" and had nothing to do with law enforcement or state organizations. He noted that he never considered the program to be an organization like MADD. The volunteers in his program did not meet together as a group. When assisting a victim, he could telephone a coordinator for limited help, such as finding a hotel room for the night or a meal, but this help did not extend to providing legal advice or advocacy. Earley stated that he did not have any reason to omit this information from his questionnaire, other than he did not think it was responsive to the question. He specifically denied having any intent to conceal this information. The trial court credited Earley's explanation and concluded that he was not trying to be deceptive or misleading when he completed his questionnaire.

With regard to appellant's assertion that Earley did not consider evidence of voluntary intoxication to be mitigating, we note that Earley had no duty to regard such

evidence as mitigating. *See Hernandez v. State,* 390 S.W.3d 310, 315 (Tex. Crim. App. 2012) ("Whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry."). Even so, defense counsel elicited Earley's testimony that, although he did not regard evidence of voluntary intoxication as a "defense," he recognized that such evidence was something a juror would "want to remember" or "take into account" during punishment deliberations.

Regarding Earley's reasons for not disclosing his volunteer work until individual voir dire, the trial court was in the best position to evaluate Earley's responses and demeanor and to make decisions about his credibility. *See Davis,* 329 S.W.3d at 807. Further, Earley's views concerning evidence of voluntary intoxication did not disqualify him. *See Hernandez,* 390 S.W.3d at 315. The court did not abuse its discretion by denying the challenge for cause. Point of error three is overruled.

In point of error four, appellant asserts that the trial court erroneously overruled his challenge for cause against prospective juror Timothy Tinsley. He argues that Tinsley was disqualified because he: (1) was "death prone," in that he would answer the special issues automatically after finding a defendant guilty of capital murder; (2) could not give fair consideration to mitigating evidence; and (3) would believe police officers over other types of witnesses.

The record shows that, during voir dire, Tinsley repeatedly stated that he would keep an open mind and consider the evidence before determining his answers to the special issues. He also stated that, after finding a defendant guilty and affirmatively

answering the future-dangerousness question, he could give fair consideration to the question of whether anything in the evidence constituted a sufficient mitigating circumstance. Tinsley's statement that he did not regard evidence of voluntary intoxication as mitigating did not disqualify him. *See Standefer v. State,* 59 S.W.3d 177, 181 (Tex. Crim. App. 2001).

After defense counsel challenged Tinsley for cause, the trial court questioned Tinsley about his ability to consider the mitigation special issue. Tinsley affirmed that, in considering the mitigation issue, he could review all of the evidence in the case to look for any mitigating circumstance that would be sufficient to warrant a life sentence. When the trial court asked him if he could keep an open mind and consider all of the evidence in determining the mitigation issue, Tinsley answered affirmatively.

Appellant also asserts that Tinsley's tendency to find police officers more credible than other witnesses disqualified him. We are not persuaded by this assertion. Tinsley indicated on his jury questionnaire that he would be inclined to find police officers more credible than other witnesses. He acknowledged during voir dire that he would give police officers "a little more respect than [he] would the average Joe." However, Tinsley added, "But everybody's human, you know, so I would just – I would listen to the story and how it's presented to determine, yeah."

The trial court was in the best position to evaluate Tinsley's responses concerning his ability to consider all of the evidence when deliberating on the special issues. *See Davis,* 329 S.W.3d at 807. Further, Tinsley's views concerning the credibility of police

witnesses did not disqualify him. *See Feldman,* 71 S.W.3d at 747 (stating that a defendant is entitled to jurors who do not hold extreme or absolute positions regarding witness credibility; if a venire person is more or less skeptical of a certain category of witness, that does not make him subject to a challenge for cause). The court did not abuse its discretion by denying the challenge for cause. Point of error four is overruled.

In point of error five, appellant asserts that the trial court erroneously denied his challenge for cause to prospective juror Robin Linn. Appellant asserts that Linn was disqualified because: (1) her questionnaire answers showed that she was "death prone," in violation of *Wainwright v. Witt;*[3] and (2) she wanted to be on the jury, as indicated by her demeanor during voir dire and by her readiness to vary her answers during voir dire from the answers she had provided on her jury questionnaire.

Linn's questionnaire answers and voir dire testimony demonstrated that she strongly favored the death penalty and that she wanted to serve on the jury. However, Linn also stated during voir dire that she did not believe the death penalty was appropriate for all homicides and that the punishment decision should depend upon the particular facts and circumstances of each case. She stated that she would consider all of the punishment evidence. She further stated that, although she would want to know if a defendant were remorseful, she would not require him to testify and express remorse.

---

[3] We infer that appellant means to say that Linn's views on capital punishment would "prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Witt,* 469 U.S. at 424.

When defense counsel questioned Linn about her questionnaire answers that reflected her strongly favorable view of the death penalty, Linn repeatedly qualified those answers. She stated that her answers on the questionnaire were "generic" and that she understood that she would have to know the facts of a particular case before she could decide whether the death penalty would be an appropriate punishment. Linn stated that the punishment decision would be based on the evidence and what she heard. Linn affirmed that she did not know how she would decide the special issues until she knew the details: "I can't tell you that I would go either way because I don't know what the facts of the case are."

Defense counsel challenged Linn for cause, arguing that her demeanor demonstrated that she was willing to change her answers during voir dire in order to be seated on the jury. The prosecutor disagreed, noting that Linn had "consistently said [she] could not go one way or the other without hearing all the evidence."

Linn's responses during voir dire did not establish that her views on capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and her oath. *See Witt,* 469 U.S. at 424. We defer to the trial court's assessment of Linn's credibility and demeanor. *Davis,* 329 S.W.3d at 807. Without more, the fact that Linn wanted to be on the jury did not disqualify her. The court did not abuse its discretion by overruling appellant's challenge for cause. Point of error five is overruled.

In point of error six, appellant asserts that the trial court erroneously overruled his

challenge for cause against prospective juror Charles Stout. He argues that Stout was disqualified because his jury-questionnaire responses showed that he would require the defendant to testify and he would shift the burden to the defense to prove the defendant's innocence. Appellant acknowledges that Stout qualified his questionnaire responses during voir dire, but he argues that Stout's voir dire statements were not "genuine."

The record does not support appellant's assertion that Stout would require a defendant to testify. When questioned about a defendant's right to remain silent, Stout stated that he understood the Fifth Amendment right not to testify and the fact that the defense had no burden of proof. Stout stated that he, personally, would want to testify if he were accused because he would want to show that the State's evidence was wrong, but he understood that someone else might make a different decision for reasons unrelated to guilt or innocence.

When the prosecutor first questioned Stout about the presumption of innocence, Stout indicated that the defendant must have done something to get arrested:

Q. ([PROSECUTOR]). Absolutely. And that's because the defendant, as the defendant sits right here, now is presumed innocent. And that is a right that everybody as a citizen has. Do you believe in that right?

A. I have [a] question about that.

Q. Okay.

A. Yes, I know that the final verdict of the law – you know, whether they're innocent or guilty, you have to present all the evidence. And this is part of this process?

Q. Yes.

A. But if you're – how can you say it?  When you're – you're presented evidence and you've approached this individual that has, you know, committed this crime.  And you want to – let's see how I should put this?

Q. Let me –

A. I think that it comes down to – yes, I think this is the proper possess [sic] for that.  But when you arrest someone – you know, when they arrest someone, they have done something.  You know, they had to have done something to be arrested.

Q. Let's talk about that a little bit.  So, what the law says is, just because you're arrested doesn't mean you're guilty.

A. Right.

Q. People get arrested all the time and are found not guilty.  Okay?  So just because you're arrested, you cannot use that.  You cannot – you have to presume him and every defendant innocent, okay?  Because everybody starts out with that presumption.  Then we have the burden to overcome that presumption.  Does that make sense?

A. I understand that process, I do.  But like, if I'm sitting here, you don't know me.  I'm not doing anything.  You can't, you know, just automatically convict me of capital murder and send me away.

Q. Exactly.

A. You know, for life or for death.

Q. Right.

A. So, I have to have done something.  I have to, you know, had to committed some type of crime [sic].  And so, that's in order for them to arrest you.

Q. All right.  And let me stop you right there.  Because that's a different burden.  For a police officer to stop you and arrest you, that's not beyond a reasonable doubt.  Okay.  They only need probable cause to do that.

A. That's the word I'm looking for.

Q. Just because you're arrested doesn't mean you're guilty beyond a reasonable doubt.

A. Okay. That's what I was looking for. That's the word I was looking for.

Q. All right. Do you agree that police officers are human and they can make mistakes just like everybody else?

A. Absolutely.

After the prosecutor explained the law concerning the State's burden, Stout indicated that

he could presume that a defendant was innocent:

Q. So the presumption of innocence says, any person that is arrested is not automatically guilty beyond a reasonable doubt. They're presumed innocent. And who has the burden to prove that he's guilty?

A. The State.

Q. That's right. We have that burden. So, if we stand up and we don't do anything, and we just sit down and say, you know what, we rest our case. What is your verdict?

A. Not guilty.

Q. Why?

A. Because you didn't prove anything.

Q. That's exactly right. So evidence that a person has been arrested, evidence that a case has been indicted, none of those things can be used to find a person guilty. Okay?

A. Right.

Q. Just like we talked about. Because police officers can make mistakes just like anyone else. Someone could be arrested, maybe a person's walking out to their car this afternoon and someone comes up behind them and mugs them, and take their purse. They don't see who that person is. Let's say the police see a guy running about a mile down the road and they

arrest that person. Does that mean that person is automatically guilty?

A. No.

* * *

Q. So I'm just trying to let you know that there's a different burden. That's a burden of reasonable suspicion or probable cause to arrest someone. And then a case goes to [the] grand jury. Grand juries hear hundreds of cases a day. Usually they take about, probably at the most, five minutes before they return an indictment or they no bill the case. So that also can't be used as evidence of guilt. Do you think that's fair?

A. Yes. Probable cause is the word I was looking for. Thank you, so much.

Q. So as we sit here right now, Mr. Muhammad is presumed innocent.

A. Yes.

Q. Can you keep an open mind and be fair, follow the law and say, right now, he's presumed innocent?

A. Yes.

When questioned by the defense, Stout made a comment that was, arguably, inconsistent with the presumption of innocence:

A. Honestly, you have to be fair. Just like the State had said earlier, it's important for you to do that. And I feel you should be fair.

All though [sic], yes, *he was arrested and it's presumed that he committed this crime*. But we have to be fair in making sure what's presented is accurate and correct. So it would be my job as a juror to listen to all the evidence equally and fairly.

(Emphasis added). Defense counsel did not question Stout about this apparent misstatement. However, counsel did ask Stout about his previous comments to the prosecutor:

Q. You mentioned that if an individual has been arrested he's probably done something to get here.

A. Yes.

Q. Okay. And I presume you feel that way?

A. Yes.

Q. Now, the law requires that you presume him innocent.

A. Right.

Q. Okay. At this point in stage [sic]. But some people – we've had people come down here in the last two weeks and say, you know, [defense counsel], I can't presume him innocent. He's come this far, I just can't do that.

And that's fine. And we send them on their way and everything is good. But we have to know. You know, you mentioned that in a round about way two or three times, and we need to know that. Do you feel that way, sir?

A. That he's presumed innocent until the State proves otherwise, yes.

Q. Okay. So that's your feelings on presumption of innocence. And just because he's been charged with something, you won't consider that?

A. No.

Although some of Stout's comments arguably suggested that he had difficulty with the presumption of innocence, Stout also stated that he would not consider the facts that a defendant had been arrested and indicted when determining whether the State had proven its case at the guilt-or-innocence phase. To the extent that Stout's responses were vacillating, unclear, or contradictory, we afford particular deference to the trial court's decision. *See Smith,* 297 S.W.3d at 268. The trial court did not abuse its discretion in

overruling appellant's challenge for cause. Point of error six is overruled.

In point of error seven, appellant asserts that the trial court erroneously overruled his challenge for cause to prospective juror Allen Harrington. Appellant argues that Harrington was disqualified because he would not properly consider mitigating evidence regarding a defendant's background, intoxication, and mental health. Appellant states that Harrington's questionnaire responses, which reflected his strong views in favor of the death penalty, were more truthful than his voir dire answers.

Harrington's questionnaire responses indicate that he strongly favored the death penalty. In response to a question asking whether he would consider background evidence as mitigating, Harrington wrote, "bull shit, cold hard facts, and DNA." When the prosecutor asked him about this response during voir dire, Harrington explained, "I don't believe that the environment or any of that other stuff matters. If it doesn't matter for me it doesn't matter for anybody. If I'm held to that everybody is held to that." He acknowledged that, as a juror, he would have to listen to all of the evidence, but he added that, after finding a defendant guilty and answering the future-dangerousness question affirmatively, "it will be a very high bar for me to hear mitigating circumstances once I'm there that would take me to that place [of voting for a life sentence]."

Harrington responded similarly when questioned by defense counsel: "What in the world could make me change my mind? Tell me what those mitigating circumstances are. Tell me what that is. Like I said, that bar will be really high. It's going to have to be really something that tells me there is some mitigating circumstances." Harrington also

clarified that, although he did not regard a person's background as a "cause" of that person's actions, he recognized that a person "might not be able to truly overcome things in [his] background." He added that he would be able to listen and consider evidence of a defendant's background. Harrington also modified his questionnaire response concerning whether voluntary intoxication could be mitigating, stating that he disagreed with the law but that he would be able to consider intoxication evidence with respect to the mitigation special issue.

Harrington was not required to regard any particular type of evidence as mitigating. *See Standefer,* 59 S.W.3d at 181. Nor was he required to regard any particular quantity of evidence as "sufficiently mitigating." Therefore, appellant has not shown that Harrington understood the requirements of the law but could not overcome his prejudice well enough to follow them. *See Davis,* 329 S.W.3d at 807. To the extent that Harrington's answers were vacillating, unclear, or contradictory, we afford particular deference to the trial court's decision. *See Smith,* 297 S.W.3d at 268. The trial court did not abuse its discretion in overruling appellant's challenge for cause. Point of error seven is overruled.

In point of error nine, appellant asserts that the trial court erroneously overruled his challenge for cause to Enrique Martinez. He argues that Martinez was disqualified because he was "an automatic death penalty juror" who would always impose a death sentence after finding guilt.

The record shows that Martinez strongly favored the death penalty but that he

understood the law and would follow it in assessing punishment. When questioned by defense counsel about his personal thoughts about the death penalty, Martinez acknowledged that he would favor a death sentence for any capital murder without regard to the special issues, and he recognized that this view was contrary to the law. However, Martinez also clarified that, without regard to his personal feelings, he would follow the law as it had been explained to him:

> Okay. But if I have to follow that I will follow that. I don't know. If it seems like – I don't know how to explain it. But my belief is my belief. But I was asked if I could listen to everything and come and follow this, that I'll be – I'm okay with it.
>
> Am I explaining myself? I'm not sure.

Defense counsel repeatedly encouraged Martinez to explain how he felt and what he believed, without regard to whether he could follow the law. In response, Martinez repeatedly stated that he would follow the law regardless of his personal feelings.

Martinez indicated on his jury questionnaire that he did not believe that a defendant's background should be considered in determining punishment, "because no matter of the background they made their choice." When defense counsel asked him about this response, Martinez reiterated his view that everyone can choose how to live and what to do. He added that he could take background evidence into consideration, but what would really matter to him would be "why" the defendant committed the offense at "that moment."

Defense counsel asked Martinez how he could reconcile his statement that he

would consider background evidence with his statement that background evidence would not matter to him. Martinez explained that he would be able to listen and get to know more about the defendant before making a judgment. Counsel then asked Martinez whether, now that he knew the law and the wording of the mitigation special issue, he could take background evidence into consideration. Martinez answered affirmatively.

Martinez also indicated on his questionnaire that he would not consider evidence of voluntary intoxication to be mitigating because "they made their choice." When defense counsel asked Martinez whether he could consider evidence of intoxication, Martinez stated that he would be able to listen and consider such evidence.

In response to a question concerning the testimony of mental-health professionals, Martinez had written on the questionnaire, "They should not [testify]." When defense counsel asked him about this response, Martinez expressed his belief that sometimes mental-health professionals could be manipulated to testify in a defendant's favor, and sometimes their testimony provided "just an excuse." However, Martinez responded affirmatively when counsel asked him if he could "be open-minded and consider that kind of evidence."

Martinez had no duty to regard any particular evidence as mitigating. *See Standefer,* 59 S.W.3d at 181. Further, to the extent that Martinez's answers were vacillating, unclear, or contradictory, we afford particular deference to the decision of the trial judge. *See Smith,* 297 S.W.3d at 268. We also defer to the trial court's assessment of Martinez's demeanor. *See Davis,* 329 S.W.3d at 807. The trial court did not abuse its

discretion in overruling appellant's challenge for cause. Point of error nine is overruled.

In point of error ten, appellant complains that the trial court erroneously denied his challenge for cause to prospective juror Paul Zugelder. He also complains that the trial court improperly curtailed defense counsel's voir dire of Zugelder when it sustained the State's objections to defense counsel asking Zugelder about the concept of mercy. He asserts that the court's rulings sustaining the State's objections gave Zugelder the impression that defense counsel was being untruthful, so that Zugelder felt compelled to ask the trial court to explain the law. Appellant concludes that the trial court's rulings thereby "deprive[d] the defendant of seating what otherwise would have been a juror that would have been a proper juror for the State."

The factual basis of appellant's point of error arose while defense counsel was examining Zugelder concerning the mitigation special issue. Counsel had been focusing on the statutory language of the mitigation issue, which was also available to Zugelder in written form. The record suggests that Zugelder had been reviewing that language as counsel discussed it. Counsel then stated that various types of evidence had the potential to be mitigating and that each juror could decide whether he or she considered particular evidence to be sufficiently mitigating. Counsel then added, "But the law specifically tells us, specifically tells us, that a juror's concept of mercy, a juror's concept of mercy alone based on anything they have heard in that case is sufficient, if they believe it to be sufficient. Now, do you hear what I'm saying there?" Zugelder responded that he did not see anything in the language of the special issue to the effect that a juror's concept of

mercy would be considered, and he asked defense counsel if it was "in there." Counsel responded, "No, if you read the words. But now the Supreme Court of the United States has told us that that's all it takes."

The prosecutor then objected that defense counsel had misstated the law because the sufficiency decision could not be based on "anything" the jury heard in the case but had to be based on something from the evidence. The trial court sustained the objection. Defense counsel continued: "Your concept of mercy based on any piece of evidence that you heard in the case. That's the law. It doesn't have to be written there. The courts have told us that." The prosecutor again objected, stating that the law was that jurors could make a decision based on mercy but not that they were required to. Defense counsel responded, "I'm not saying that they do, Judge," and the court sustained the objection.

Defense counsel again resumed his explanation of the concept of mercy:

The law in our land says that your concept, a juror's concept of mercy based on evidence that they heard in the case, if you believe it rises to the level [of] sufficiency you can act upon that. And that is the law of our land. Now, if we're going to sustain an objection to that, Judge, then –

The prosecutor then objected to the sidebar and again stated that any idea of mercy had to be "based on the evidence." Defense counsel responded, "Based on the evidence. I said it." The prosecutor asserted that counsel kept omitting that language. Defense counsel disagreed. Counsel reiterated his explanation of the concept of mercy as it applied to the mitigation issue:

Concept of mercy. That's all it takes. And the only reason they stand up is because in its simplicity it tells us, sir, that your concept of mercy alone based on any piece of evidence you've heard in that case, if you believe it's sufficient, it's sufficient under the law.

Now, I'll ride that horse to the finish line, sir, because that's the law of our land. It doesn't have to be written there because we know the Supreme Court of the United States has told us that's the law.

At that point, Zugelder turned to the trial judge for clarification, stating that he understood defense counsel to be saying that a juror could "feel pity for the defendant and make a decision to kind of dismiss Special Issue Number 2 just if we don't feel like he should be punished to the full extent of the law." The judge stated that he did not believe that defense counsel had said that. He then asked the parties if he could clarify the matter. Defense counsel responded, "Well, Judge, you can say anything you want to, Judge. I mean, the law is the law."

The trial judge then provided a detailed explanation:

Well, I'll just tell you on Special Issue Number 2 what our legislature has envisioned, what the Supreme Court has upheld, is that the jury after having found Special Issue Number 1 answering, yes, that in other words, that the jury does consider the defendant that's on trial to be a continuing threat to the society or wherever he finds himself in the case of a capital murder case – of course, it's going to be the penitentiary – then you have to consider Special Issue Number 2. In considering Special Issue Number 2, you have to go back in your mind and in your deliberations with the other eleven jurors and revisit all of the evidence that's been presented in both phases of the trial[,] the guilt-innocence phase, and the punishment phase. And there might have been something that you heard when you heard it as it was presented during the trial and you look at Special Issue Number 2 and you're taking into consideration all of the evidence including the circumstances of the offense – so that's the first part of the trial. That's where you look at the offense itself in the guilt-innocence phase of the trial, and the defendant's character and background. More of that probably

comes in during the second phase of the trial than in the first phase of the trial, but there could be some evidence that would come in in the first phase of the trial considering that, and the personal moral culpability of the defendant. "There is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence should be imposed." And I think what [defense counsel] is telling you that's your safety net or that's the – he uses the example of a light switch to turn the switch from death back to life in prison. If you heard something in the trial you thought was sufficient, certain circumstances or circumstance . . . and that you thought you know what? I know this is a terrible crime. I know I found that I think he will be a future danger, but because of that one circumstance I think that's sufficient for me to warrant giving him a life sentence rather than a death sentence. And that can be based on anything that you want to base it on. And everybody is individually different. In other words, what [defense counsel] says [is that] the person sitting next to you or behind you might see something else that you don't think is mitigating, and you might see something that they don't think is mitigating.

After hearing this explanation, Zugelder stated that he would not make a decision solely out of mercy but would "want something presented in evidence to justify a decision to change the decision from death to life presented to justify that."

Defense counsel again explained that the concept of mercy would be based on something in the evidence that would prompt Zugelder to conclude that the defendant should receive a life sentence. Zugelder agreed that he could make a decision on that basis. He explained that he had initially understood defense counsel's question as asking him whether he could "just make a decision just to be merciful." Zugelder explained that he had sought an explanation "from a third person" because that was what he had heard even though it was not what counsel had intended to say.

Defense counsel again clarified, "So when we talk about the concept of mercy, it's

the concept of being able to actually act upon your belief that there was something that you heard that would warrant switching that back from death to life." Zugelder again affirmed that he could do that. Defense counsel acknowledged that perhaps he had not explained the concept very well the first time.

Defense counsel challenged Zugelder for cause based on his questioning being interrupted by the prosecutor's objections and based on the possibility that the trial court, in sustaining the prosecutor's objections, had given Zugelder the impression that defense counsel was dishonest. The prosecutor responded that he kept objecting because defense counsel kept incorrectly explaining the law. In particular, the prosecutor asserted that defense counsel never said that a juror could find a reason to consider mercy "based on the evidence," which confused Zugelder and prompted him to ask the trial court for clarification. The prosecutor averred that, after the judge cleared up Zugelder's confusion about the role of mercy in considering the mitigation issue, defense counsel asked the question properly. The trial judge stated that it was his impression that Zugelder was confused about how the concept of mercy applied to the mitigation special issue.

Assuming that defense counsel could properly question Zugelder concerning his ability to dispense mercy as defense counsel described the concept, we find that appellant's argument is without merit. On this record, it appears that the prosecutor's first objection was proper because, as defense counsel acknowledged, counsel initially failed to specify that whatever Zugelder perceived as giving rise to mercy in the context of the mitigation issue had to be based on the evidence presented at trial.

The trial court did not rule on the prosecutor's second objection. Although unnecessary, the prosecutor's third objection, that the law stated that a juror could consider mercy but was not required to, did not contradict anything that defense counsel had said, nor did it operate to prevent counsel from asking a question. Therefore, the trial court's ruling sustaining that objection could not have affected Zugelder's impression of defense counsel's credibility. Further, defense counsel continued to question Zugelder about the concept of mercy and eventually elicited Zugelder's answer to his question. *See Woods v. State,* 152 S.W.3d 105, 110 (Tex. Crim. App. 2004) (finding no harm where the record reflected that counsel was able to ask the venire person a question that was essentially the same as the denied question, or that he was able to elicit the same information that the denied question sought to elicit).

Based on the totality of Zugelder's voir dire, the trial court could have reasonably concluded that Zugelder had asked for clarification because he was confused by defense counsel's explanation, and not because he mistrusted defense counsel. *See Feldman,* 71 S.W.3d at 744 ("When reviewing a trial court's decision to grant or deny a challenge for cause, we look at the entire record to determine if there is sufficient evidence to support the court's ruling."). The trial court did not abuse its discretion in overruling appellant's challenge for cause. Point of error ten is overruled.

In point of error eleven, appellant asserts that the trial court erroneously overruled his challenge for cause to prospective juror David Hornstein. Appellant asserts that Hornstein was disqualified based on his: (1) demeanor; (2) inability to consider

defendant's character and background in mitigation; (3) inability to consider mental health professionals' testimony in mitigation; and (4) failure to consider voluntary intoxication as potentially mitigating.

The trial court was in the best position to evaluate Hornstein's demeanor, and the record before us does not support appellant's assertion that Hornstein's demeanor disqualified him from jury service. *See Davis,* 329 S.W.3d at 807. Concerning his attitudes toward potentially mitigating evidence, the record shows that Hornstein responded negatively to a question on the juror questionnaire that asked whether a defendant's background should be considered in determining the mitigation special issue. When defense counsel questioned him about this response, Hornstein stated that if he had known about the special issues when he filled out the questionnaire, he might have answered the questions differently. Hornstein suggested that he had understood the questions to ask whether evidence such as background would be relevant to the jury's determination of guilt.

Hornstein expressed his understanding that the mitigation special issue was "an additional filter through which [the defense is] hoping to provide a possibility of reducing the severity of the punishment." Defense counsel agreed with that characterization. Hornstein stated that he thought it was a "valid filter," but then he asked whether the jury would hear any additional or different evidence after reaching a verdict of guilty. This question indicated that Hornstein was confused about the timing of the presentation and consideration of evidence at different phases of the trial.

Defense counsel answered Hornstein's question by explaining that the jury would hear evidence at the punishment phase that was not relevant to the guilt-or-innocence phase. Counsel explained that the guilt-or-innocence phase was "like a photograph," the contents of which the State had to prove beyond a reasonable doubt, while the punishment phase involved "the entire photo album . . . of the defendant's life." Hornstein then stated that he would be able to consider all of the evidence in determining the mitigation special issue, including the defendant's character and background: "If it provides the possibility of someone being spared the death penalty, yes, absolutely."

On his juror questionnaire, Hornstein responded to a question about mental-health professionals by indicating that he thought that their testimony would "do more harm than good." When defense counsel asked him about this response, Hornstein explained that he would be more concerned with a defendant's history and past conduct than a professional's opinion of the defendant after an hour-long interview. He stated that such testimony was "something to pay attention to," but it did not "hold as much validity as the whole history of the person." He stated that he did not regard psychology as a science, and he did not believe that mental-health professionals were any more qualified than other people to "evaluate human beings." He stated that he would listen to their testimony but he would not regard it as "expert" testimony. Hornstein affirmed that he would keep an open mind and consider all types of evidence. He stated that he would not discount the opinions of mental-health professionals but would consider them together with everything else.

Hornstein also wrote on the juror questionnaire that he did not think intoxication evidence should be mitigating. But when defense counsel questioned him about this response, Hornstein stated that, without regard to his personal opinions, he would be willing to consider such evidence in mitigation because the law required him to do so.

Hornstein's statements indicating his initial confusion about the role of background evidence, his skepticism with regard to the testimony of mental-health professionals, and his opinion that intoxication evidence was not mitigating, did not disqualify him. *See Feldman,* 71 S.W.3d at 747; *Standefer,* 59 S.W.3d at 181. Further, after the different phases of the trial had been explained to him, Hornstein affirmed that he would consider all of the evidence when determining his answers to the special issues. To the extent that Hornstein's answers were conflicting or vacillating, we defer to the trial court's decision. *See Smith,* 297 S.W.3d at 268. The trial court did not abuse its discretion in overruling appellant's challenge for cause. Point of error eleven is overruled.

In point of error twelve, appellant asserts that the trial court erred by denying his challenge for cause to prospective juror Andrea Griffith. He argues that Griffith was disqualified because she was "mitigation impaired" and could not properly consider all potentially mitigating evidence. Appellant avers that Griffith's responses on her written questionnaire and during voir dire showed that she would not be able to adequately and properly consider "any and all evidence that may be presented regarding sufficiently mitigating circumstances that are required by law."

Griffith's questionnaire responses indicated that she would not regard background and intoxication evidence as mitigating. However, after the special issues were explained to Griffith during voir dire, she stated that she could give effect to all of the evidence submitted, including intoxication, when determining the mitigation special issue. Griffith was not required to regard any particular type of evidence as mitigating, so long as she could consider all of the evidence in deliberating on the mitigation issue. *See Hernandez,* 390 S.W.3d at 315. The trial court did not abuse its discretion in overruling appellant's challenge for cause. Point of error twelve is overruled.

In point of error thirteen, appellant complains that the trial court erroneously denied his challenge for cause to prospective juror Bradford McCutheon. Appellant avers that McCutheon was disqualified because he could not give fair consideration to the special issues. The record shows that, although McCutheon's questionnaire and voir dire responses demonstrated that he strongly favored the death penalty, they also showed that he would consider the evidence when deciding the special issues. McCutheon repeatedly stated during voir dire that he would not answer the special issues in such a way that the death penalty would result just because he had found someone guilty of capital murder. He stated that he would follow the law and "keep an open mind all the way through" the process. The trial court did not abuse its discretion in overruling appellant's challenge for cause. Point of error thirteen is overruled.

In point of error fourteen, appellant asserts that the trial court erroneously denied his challenge for cause to prospective juror Elvira Corpus. He asserts that she was

disqualified because she would automatically impose a death sentence after finding a defendant guilty of capital murder.

Corpus indicated on her jury questionnaire that she thought that background circumstances were sometimes "just an excuse" that should not be considered in determining proper punishment. However, during voir dire, Corpus stated that she could consider such evidence. She specifically agreed that she could consider mental-health and substance-abuse evidence. She opined that intoxication evidence was not mitigating, but she added that she could consider it. Corpus repeatedly stated that after finding a defendant guilty, she could keep an open mind and hear the evidence before deciding the special issues. She stated that she would not automatically answer either special issue but would listen to the evidence and make her decision on that basis.

Appellant also complains that the defense was prevented from asking Corpus a proper question "regarding automatic death" because the trial court sustained the State's objection. The record shows that Corpus answered "yes" to question number three on the questionnaire, which asked, "If you are in favor of the death penalty in some cases, do you agree that a life sentence, rather than the death penalty, would be appropriate under the proper circumstances in some cases?" During voir dire, the prosecutor asked Corpus to elaborate on this response. Corpus replied that, depending on "what took place" during the offense, the death penalty might not be appropriate. The prosecutor then explained to Corpus that there would be no conviction for capital murder if the offense was justified or accidental.

Later, defense counsel followed up on this topic. He explained that a capital murder always involves an intentional murder in which there is no justification and there is always violence. Counsel then asked Corpus whether she would change her answer to question number three, and she responded that she would. Counsel asked her what her new answer would be, and Corpus answered, "Let's see. Wait a minute. It would have to be – no." Counsel then asked more specifically, "So to question number three, knowing now that there would be no justification you don't agree that a life sentence would be appropriate under certain circumstances in a capital murder case?"

Before Corpus could answer the question, the prosecutor objected that Corpus had "already previously stated that in certain circumstances that if she feels it's appropriate that she could give a life sentence." The trial court sustained the objection. Defense counsel then asked Corpus whether her previous statement to the prosecutor was based on a scenario involving justification or "no violence," and Corpus answered affirmatively. She reiterated that her answer to question number three would now be, "No."

Assuming without deciding that the trial court abused its discretion by preventing defense counsel from asking Corpus whether she had decided that a life sentence was not appropriate in a capital-murder case, we find no harm because counsel was allowed to elicit essentially the same information from Corpus when he asked her whether she would change her answer to question number three, and whether she would now answer the question in the negative. *See Woods,* 152 S.W.3d at 110. A review of Corpus's entire voir dire reveals that the parties covered this area of inquiry thoroughly, and therefore

appellant was not harmed when the trial court sustained the prosecutor's objection.

Corpus's opinions regarding the mitigating value of particular types of evidence did not disqualify her. *See Hernandez,* 390 S.W.3d at 315. She stated that she could consider all of the evidence in determining the special issues. To the extent that Corpus vacillated or made conflicting statements, we defer to the trial court's decision. *See Smith,* 297 S.W.3d at 268. The trial court did not abuse its discretion in overruling appellant's challenge for cause. Point of error fourteen is overruled.

In point of error fifteen, appellant asserts that the trial court erroneously denied his challenge for cause to venire person Temple Koestner. He avers that she was disqualified because she would "automatically equate a guilty verdict with a death sentence" and would be unable to give appropriate consideration to the special issues.

Koestner's questionnaire responses demonstrated that she strongly favored the death penalty. During voir dire, however, Koestner affirmed that, after convicting a defendant of capital murder, she would have an open mind and would allow the evidence to inform her decision on punishment. She again affirmed that she would have an open mind when considering whether the evidence was sufficiently mitigating.

However, when defense counsel questioned her about situations in which she would automatically assess the death penalty, Koestner identified cases involving the murder of a child, the murder of two or more people, murder for hire, murder in the course of kidnapping or robbery, or murder of a fireman. Defense counsel asked Koestner for clarification, and it became apparent that she was confused about the

function of the special issues in assessing punishment:

> Q. Okay. And so if you were on a hypothetical jury and you guys believed each and every element beyond a reasonable doubt that would equate to a guilty verdict on a capital murder, any of those that you just listed, then at that point you would always answer those two special issues in such a manner where the sentence would always be death. Is that what you're telling me, Ms. Koestner?
>
> A. That I would answer them – no. We would have to go through those particular situations as what the gentleman said earlier. If there's a reasonable doubt they would have to be found not guilty.
>
> Q. No, ma'am. Let me back you up.
>
> A. I'm sorry. I'm confused here then.
>
> Q. It's okay. You're fine. You're fine. But when we get to the point of actually talking about a sentence, you have to remember we're talking about a death sentence. That's punishment.
>
> A. Right.
>
> Q. So that means that a person has already been found guilty beyond a reasonable doubt.
>
> A. Okay.
>
> Q. Okay. So I think –
>
> A. Found guilty already?
>
> Q. Yes, ma'am.
>
> * * *
>
> Q. (BY [DEFENSE COUNSEL]) The law states, Ms. Koestner, is [sic] that in order for a death sentence to be rendered, that after the individual has been found guilty beyond a reasonable doubt of that capital murder charge – like I said, you listed them. We know what you're talking about over there.

A. Okay.

Q. That once the person has been found guilty beyond a reasonable doubt the law states that in order to get to a death sentence those two special issues have to be answered in a particular fashion. Special issue number one has to be answered in the affirmative.

Special issue number two is that there's nothing sufficiently mitigating to warrant saving the defendant's life. That's what the law states.

A. Yes.

Q. Now, some people say that their feelings are so strong in some of these examples of capital murder, they understand what the law is, but regardless of what the law is that once they reach a guilty verdict that at that point they will also answer these two special issues in such a fashion where the sentence will always be death. That's my question to you.

A. So will I always answer death?

Q. Yes, ma'am.

A. No.

After additional discussion, Koestner expressed her understanding that after a defendant was found guilty of capital murder, the sentence would be life without parole unless and until the jury answered the special issues in such a way that a death sentence would be imposed.

Counsel then asked Koestner about her questionnaire response indicating that a capital murderer would always pose a future danger. Koestner stated that she would not necessarily find that a defendant was a future danger based solely on the offense of conviction because he would be in prison, and she did not think that a capital murderer

would be a threat to prison society. When defense counsel asked Koestner if that meant that she would always answer the future-dangerousness question in the negative, she acknowledged that she was confused. Counsel did not attempt to clarify Koestner's position further but instead moved on to the mitigation issue.

Koestner stated that she could take all of the evidence into consideration in answering the mitigation issue. Defense counsel then asked her about her questionnaire answer that indicated she would not consider a defendant's background or character in making the punishment decision. Koestner explained that she had not known about the special issues when she answered the question. Once Koestner understood the special issues, she recognized that her questionnaire answer was incorrect under the law. Koestner stated that she still felt that people make their own choices, but now that she knew how the guilt phase and the punishment special issues worked, she could consider such evidence in reaching a decision on the mitigation special issue.

Appellant did not establish that Koestner understood the requirements of the law but could not overcome her prejudice well enough to follow it. *See Davis,* 329 S.W.3d at 807. After the law was explained to her, Koestner affirmed that she could set aside her personal feelings. *See Feldman,* 71 S.W.3d at 744. To the extent that Koestner vacillated, we defer to the trial court's decision. *See Smith,* 297 S.W.3d at 268. The trial court did not abuse its discretion in overruling appellant's challenge for cause. Point of error fifteen is overruled.

In point of error sixteen, appellant asserts that the trial court erroneously denied his

challenge for cause to venire person Nancy Munn. He argues that Munn was disqualified because she was "death prone." He avers that she could not consider the mitigation issue after finding that a defendant was guilty and posed a future danger. He acknowledges that during voir dire, Munn vacillated and equivocated concerning the special issues, but he argues that "her true feelings" were that she would be unable to consider all of the evidence. In addition, appellant argues, Munn thought it might violate her conscience to find a defendant not guilty due to a "technicality" even if the law demanded it, and she would believe police officers over other witnesses.

The record does not support appellant's allegations. When asked about the special issues, Munn affirmed that she would keep an open mind and listen to all of the evidence. When asked about her questionnaire answer indicating her belief that the death penalty should be available in a case involving the death of a child, she stated that she would not automatically impose the death penalty in such a case. When defense counsel asked Munn about her questionnaire response indicating that she thought the death penalty was imposed too seldom because of "the cost [to] taxpayers" of housing inmates and hearing appeals, Munn answered that she "was answering this questionnaire based on beliefs that I've had, but not really being involved in the circumstances where I've been put in a position of having to make a decision like that." She stated that she would decide the answers to the special issues based on the facts before her and not on "the financial part."

Defense counsel asked Munn about her questionnaire response indicating that a defendant's character and background should not be considered when determining the

proper punishment. Munn stated that she had not known the law when she completed the questionnaire, but now that she had learned about the law during voir dire, she would "look at everything differently with different eyes." When counsel asked Munn why she had stated earlier that she felt that death would always be appropriate in a case involving the death of a child, she stated that she had answered based on her personal beliefs, but now that she was familiar with the process, she would take all of the facts into consideration.

When asked what the result at the guilt phase would be if the State proved that the defendant was guilty of the offense but failed to prove venue, Munn responded that she would have to find that the defendant was innocent. She stated that she could do it but acknowledged that it would be hard. She affirmed that she could hold the State to its burden of proof.

Munn indicated on her questionnaire her belief that police officers were more likely than the average person to tell the truth, but she also wrote that officers "are people so they make mistakes." During voir dire, she testified that she would treat all witnesses the same. She noted that people do not tell the truth all the time, police officers are human, and she would not automatically find an officer more credible than other witnesses but instead would listen to the testimony to judge each witness's credibility.

Munn's testimony during voir dire showed that she would assess a sentence based on the law and that she would consider any evidence offered in determining her answers to the special issues. *See Feldman,* 71 S.W.3d at 747. She did not say that she would be

unable to find a defendant not guilty based on a "technicality." Her responses concerning police officer testimony did not disqualify her. *Id.* To the extent that Munn's answers were vacillating, unclear, or contradictory, the trial court appropriately considered her demeanor and credibility in determining her qualifications. *See Threadgill v. State,* 146 S.W.3d 654, 667 (Tex. Crim. App. 2004). The trial court did not abuse its discretion in denying appellant's challenge for cause. Point of error sixteen is overruled.[4]

In point of error seventeen, appellant asserts that the trial court erroneously denied his challenge for cause to prospective juror Ernest Hand. Appellant argues that Hand was disqualified because he was "death prone."

In his questionnaire responses, Hand indicated that he strongly favored the death penalty and he believed that a defendant's background should not be considered when determining punishment. However, he also indicated that the death penalty should not be applied in all murder cases. During voir dire, Hand reiterated his opinion that some murderers deserve a life sentence. He testified that after finding a defendant guilty of capital murder, he could "refocus" and give the special issues a "fair look." He would not automatically answer the special issues in such a way that death would result. Instead, he would "wait and listen" to all of the evidence before answering the special issues. Hand stated that, if the State's evidence did not persuade him beyond all reasonable doubt that

---

[4] Appellant exercised his second extra peremptory strike against venire person Robin Swarz, but he does not complain on appeal about the trial court's denial of his challenge for cause against her.

the defendant would continue to victimize others, he could answer the future-dangerousness question in the negative. Hand affirmed that, even after finding a defendant guilty and a future danger, he could still answer the mitigation special issue in such a way that a life sentence would be imposed.

Hand testified that he would listen to any evidence presented on the special issues. *See Threadgill,* 146 S.W.3d at 667. He was not required to regard evidence of background as mitigating. *See Standefer,* 59 S.W.3d at 181. To the extent that his responses were vacillating or contradictory, we afford particular deference to the trial court's decision. *See Smith,* 297 S.W.3d at 268. The trial court did not abuse its discretion in denying appellant's challenge for cause. Point of error seventeen is overruled.

Because appellant has not shown that the trial court erroneously denied his challenges for cause to at least three prospective jurors, we need not address his points of error one and eight, concerning his challenges to voir dire members Milton Powell and Anthony Morrison. Points of error one and eight are overruled.

ALTERNATE JURORS

In points of error eighteen through twenty, appellant asserts that the trial court erroneously denied his challenges for cause to three prospective alternate jurors. Article 35.15(d) provides, in relevant part, that if one or two alternate jurors are to be impaneled, each party is entitled to one peremptory challenge to be used against an alternate juror. In accordance with Article 35.15(d), appellant received one peremptory strike to use in the

selection of alternate jurors. Therefore, to demonstrate that he is entitled to relief, appellant must show that the trial court erroneously denied one of his challenges for cause to prospective alternate jurors. He must also show that he unsuccessfully requested an additional peremptory strike which he would have used to remove another alternate juror whom he identified as "objectionable" and who actually sat on the jury. *See Busby v. State,* 253 S.W.3d 661, 670 (Tex. Crim. App. 2008); *see also Harris v. State,* No. AP-76,810, slip op. at 24 & nn.51-52 (Tex. Crim. App. May 21, 2014) (not designated for publication), *cert. denied*, 135 S. Ct. 945 (2015) (finding no harm when jurors identified as objectionable did not participate in deliberations).

In point of error eighteen, appellant asserts that the trial court erroneously denied his challenge for cause to prospective alternate juror Elizabeth McDaniel. He argues that McDaniel was disqualified because her written questionnaire responses indicated that she: (1) was "death prone"; (2) would automatically assess a death sentence after convicting a defendant of capital murder; (3) would not adequately consider the future-dangerousness special issue; and (4) would require a defendant to show remorse before she could answer the mitigation issue affirmatively.

As appellant acknowledges, the answers that McDaniel provided during voir dire, after the law was explained to her, differed from her questionnaire responses. During voir dire, McDaniel affirmed that, after finding a defendant guilty of capital murder, she would be open to returning a sentence of either life in prison or death. She stated that she would not automatically answer the special issues in such a way that a death sentence

would result. She affirmed that, if she found a defendant guilty of capital murder, she would hold the State to its burden to prove to her that the defendant would commit other criminal acts of violence before she would answer the future-dangerousness special issue affirmatively. She also stated that she would be open to answering the mitigation issue affirmatively and would consider all of the evidence. On her questionnaire, McDaniel opined that criminals showed little remorse and faced light consequences. However, she stated during voir dire that she would not require a defendant to testify and show remorse before she could answer the mitigation issue affirmatively. The trial court did not abuse its discretion in denying appellant's challenge for cause. Point of error eighteen is overruled.

In point of error nineteen, appellant asserts that the trial court erroneously denied his challenge for cause to prospective alternate juror Arleen Jimenez. Appellant did not have any more peremptory strikes, and his request for an additional strike was denied. Jimenez was seated, over his objections, as an alternate juror. When another juror was removed from the jury, Jimenez took his place. Appellant argues that Jimenez was disqualified because, based on her questionnaire and voir dire responses, she would automatically give a death sentence to anyone convicted of capital murder.

Jimenez's written questionnaire responses indicated that she strongly favored the death penalty, but they also indicated that she did not think the death penalty was an appropriate punishment in all murder cases. During voir dire, Jimenez stated, "Well, I'm not 100 percent death. . . . Probably before all these people were being released after 20

years plus then I was probably at 100 percent. But recent activity here makes you wonder sometimes." She repeatedly affirmed that, after finding a defendant guilty, she could keep an open mind and not automatically answer the special issues. Jimenez twice opined that drowning was a horrible way to die, but she added that knowing that the offense had involved drowning would not automatically lead her to impose a death sentence. Jimenez stated that the facts and severity of the offense, plus a prior criminal record, would be important to her in deciding the appropriate punishment. Jimenez expressed her understanding that the State had to prove future dangerousness beyond a reasonable doubt.

Jimenez affirmed that, even after answering the future-dangerousness question affirmatively, she would not automatically answer the mitigation issue negatively. Although she had noted on her questionnaire that too many people used background or intoxication as excuses for their misconduct, she stated during voir dire that she would be able to consider such evidence in mitigation. She stated that she "would have had to hear everything."

To the extent that Jimenez's answers were conflicting or vacillating, the trial court was in the best position to evaluate her testimony and qualifications. *See Smith,* 297 S.W.3d at 268. The trial court did not abuse its discretion in denying appellant's challenge for cause. Point of error nineteen is overruled.

In point of error twenty, appellant complains that the trial court erroneously denied his challenge for cause to prospective alternate juror Dan Blanks. However, the record

shows that Blanks did not participate in jury deliberations. Therefore, appellant cannot show any harm. *See Busby,* 253 S.W.3d at 670. Point of error twenty is overruled.

In points of error twenty-one and twenty-two, appellant asserts that the jury as constituted was biased or prejudiced, thus depriving him of a fair trial in violation of his rights to due process guaranteed by the United States Constitution, the Texas Constitution, and Article 35.16. Because appellant has not demonstrated that any juror who served on his case was biased or otherwise disqualified, or that he was otherwise harmed, he has failed to show that he was deprived of a fair trial. *See Gray v. State,* 233 S.W.3d 295, 301 (Tex. Crim. App. 2007). Points of error twenty-one and twenty-two are overruled.

GUILT-OR-INNOCENCE PHASE

Points of error twenty-three through twenty-six concern the admission of autopsy photographs at the guilt-or-innocence phase. In points of error twenty-three and twenty-four, appellant complains that the trial court erroneously admitted autopsy photographs of the victims over appellant's Rule 403 objection that their probative value was substantially outweighed by their prejudicial effect. TEX. R. EVID. 403.[5] State's Exhibits 11 through 23 were autopsy photographs of Elijah. State's Exhibits 4 through 9 were autopsy photographs of Naim.

Defense counsel argued that any probative value of the photographs was

---

[5] Unless otherwise indicated, all future references to Rules refer to the Texas Rules of Evidence.

substantially outweighed by their prejudicial effect because the defense conceded that appellant committed the offense and also conceded "causation in the manner alleged." Counsel further argued that the photographs were unnecessary because there was no legal or factual question about what they depicted. The trial court overruled appellant's objections, finding that the probative value of the photographs outweighed their prejudicial effect.

Defense counsel then argued that the photographs were numerous and duplicative. The prosecutor responded that she had met with the medical examiner, Dr. Tracy Dyer, who had selected the photographs that Dyer deemed necessary for her testimony concerning "all the injuries on these two children that she observed during their autopsies." The prosecutor noted that the nineteen photographs she offered were drawn from a group of "nearly 200 photographs." The trial judge stated, "You have my ruling."

Appellant complains that the photographs were excessive and numerous, some of them were extremely gruesome, and they were all in color. He argues that the prosecutor presented them to appeal to jurors' emotions. He suggests that the photographs were particularly prejudicial because there was no controverted issue concerning the cause of death.

The admission of photographs over an objection is within the sound discretion of the trial court. *Sonnier v. State,* 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). Generally, a photograph is relevant if verbal testimony concerning the matter depicted in the photograph is also relevant. *Gallo v. State,* 239 S.W.3d 757, 762 (Tex. Crim. App. 2007).

Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Id.* However, otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* A court may consider several factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including, but not limited to: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed. *Id.* The availability of other means of proof and the circumstances unique to each individual case must also be considered. *Id.*

Although appellant did not present evidence or argument controverting the State's case at the guilt-or-innocence phase, he pleaded not guilty. Therefore, the State had the burden to prove every element of the offense of intentionally or knowingly causing the deaths of two people during the same criminal transaction. *See* TEX. PENAL CODE § 19.03(a)(7). The State had to prove not only that appellant inflicted the injuries that led to the victims' deaths, but also that he acted with the conscious objective or desire to cause death or with awareness that his conduct was reasonably certain to cause death. *See, e.g., Landrian v. State,* 268 S.W.3d 532, 537 n.27 (Tex. Crim. App. 2008); *see also Medina v. State,* 7 S.W.3d 633, 636 (Tex. Crim. App. 1999). The number and location of wounds inflicted are probative of a defendant's intent to kill and his mental state at the time of the offense. *See Motilla v. State,* 78 S.W.3d 352, 359 (Tex. Crim. App. 2002).

Additionally, evidence of injury may be probative of the specific circumstances of the murder and the veracity of a defendant's statement to police. *See, e.g., Rojas v. State,* 986 S.W.2d 241, 250 (Tex. Crim. App. 1998). Further, the State was entitled "to present to the jury a picture of the events relied upon." *United States v. Fields,* 483 F.3d 313, 354-56 (5th Cir. 2007) (quoting *United States v. Hall,* 152 F.3d 381, 401 (5th Cir. 1998); *Old Chief v. United States,* 519 U.S. 172, 187 (1997)). The factual matter to which evidence is directed need not be in dispute. *Id.*; *see also United States v. Cisneros,* 203 F.3d 333, 348 (5th Cir. 2000) (stating that a defendant's offer to stipulate to murder victim's shooting did not reduce the probative value of evidence of how victim's parents found their son, pathologist's testimony about victim's autopsy, or photographs of victim's corpse).

Exhibits 11 and 12 were autopsy photographs of Elijah showing his appearance and clothing when his body arrived at the medical examiner's office. Dr. Dyer used Exhibit 11, which depicted fluid coming from Elijah's nose, to explain the process of postmortem purging. She used Exhibit 12, which depicted paper bags placed over Elijah's hands, to explain the medical examiner's office's standard practice for preserving evidence and collecting fingernail clippings. Exhibit 13 depicted Elijah's body after it had been cleaned for the autopsy. Dyer used Exhibits 14 through 21 to describe the injuries she observed during the external examination of Elijah. Each photograph was a close-up of a specific part of Elijah's body depicting a different area of injury. Specifically, Exhibits 14 and 15 depicted Elijah's facial injuries; Exhibit 16 depicted a

linear abrasion on his back; Exhibit 17 depicted an abrasion on the outside of his left leg; Exhibit 18 depicted abrasions and a blister on the sole of his left foot; Exhibit 19 depicted abrasions on the top of his right foot; Exhibit 20 depicted abrasions on the back of his lower right leg; and Exhibit 21 depicted an abrasion on his wrist. Exhibits 22 and 23 depicted injuries that Dyer observed during the internal examination of Elijah. Specifically, Exhibit 22 depicted bruising on the underside of Elijah's scalp that was not clearly visible externally. Exhibit 23, a photograph of a section of Elijah's upper airway that had been removed from his body, depicted the dirt and debris in Elijah's airway.

Dyer used Exhibits 4 through 9, autopsy photographs of Naim, in the same manner she had used the autopsy photographs of Elijah. Specifically, Exhibit 4 showed Naim's appearance and the clothes he was wearing when he arrived at the medical examiner's office. It also depicted white foam coming from his nose and mouth, the result of postmortem purging. Exhibit 5 showed Naim's body after it had been cleaned for autopsy. Exhibits 6 through 8 were close-up photographs of specific parts of Naim's body. Each photograph depicted a different area of injury that Dyer observed during the external examination. Specifically, Exhibits 6 and 7 depicted abrasions on the right side of Naim's face and forehead, and Exhibit 8 depicted abrasions on the back of his hand. Exhibit 9 depicted injuries that Dyer observed during the internal examination, specifically, bruising on the underside of Naim's scalp, caused by impacts that did not

result in visible external bruising.[6]

Dyer was entitled to testify to the manner of death, cause of death, and the number and types of injuries the victims sustained. *See Long v. State,* 823 S.W.2d 259, 274, 275 (Tex. Crim. App. 1991). These were issues as to which the photographs were relevant. *See id.* The fact that appellant did not contest the manner of death did not render the medical examiner's testimony or the photographs irrelevant. *See id.* The State minimized the number of photographs and used only those necessary for Dyer's testimony. These photographs were not particularly numerous or gruesome. *See Gallo,* 239 S.W.3d at 763-64. The photographs of internal injuries depicted bruising and other damage that were not visible externally and which were attributable to appellant's actions. Therefore, the photographs were relevant to establishing the manner of death. *See Ripkowski v. State,* 61 S.W.3d 378, 392-93 (Tex. Crim. App. 2001) (finding that a photograph of an organ that had been removed from the victim's body, depicting bruising that Ripkowski inflicted during the offense, was not unduly prejudicial and was highly relevant to the manner of death); *see also Gallo,* 239 S.W.3d at 763 (stating that autopsy photographs showing injuries on the underside of the victim's scalp that were not visible externally were highly probative to show the full extent of the injuries appellant inflicted, and, although they were gruesome, there was no danger that the jury would attribute the mutilation caused by the autopsy procedure to the defendant). The trial court did not abuse its discretion by

---

[6] Appellant identifies State's Exhibit 9 as an "extreme closeup of [Naim's] chest showing bruising." This identification does not correspond to the exhibit in the reporter's record.

admitting State's Exhibits 11 through 23 and 4 through 9. Points of error twenty-three and twenty-four are overruled.

In points of error twenty-five and twenty-six, appellant asserts that the trial court erroneously admitted State's Exhibits 77 and 78, autopsy-identification photographs of Elijah and Naim that were introduced during Kametra's testimony. Each photograph was a close-up view of the face and bare upper torso of the deceased child. The medical examiner's placard showing the autopsy-identification number was placed across the child's chest. Appellant complains that the jury had already seen autopsy photographs of the children, including photographs of their faces, during the medical examiner's testimony. He "incorporates by reference as if set out verbatim the argument and authorities presented in [points of error] 23 and 24 to support this issue that the trial court reversibly erred in overruling Appellant's objections to State's Exhibits 77 and 78."

At trial, defense counsel objected under Rule 403 to the admission of these photographs. He asserted that there was no issue regarding the identities of the children and that he had offered to stipulate to their identities. Counsel further argued that, in light of the defense's concession of guilt, the photographs had no probative value and were offered only to provoke a visceral response from Kametra during her testimony. The prosecutor responded that, because appellant pleaded not guilty, the State was required to prove the victims' identities beyond a reasonable doubt. The prosecutor also noted that the State had not yet proven the victims' identities because Dyer did not have personal knowledge of their identities. The trial court examined the photographs and overruled

appellant's objection. At the conclusion of Kametra's direct examination, the prosecutor showed her State's Exhibits 77 and 78. She identified the child depicted in Exhibit 77 as Elijah and the child depicted in Exhibit 78 as Naim.

These photographs were relevant because Kametra's identification of the children linked Dyer's autopsy reports and testimony to the victims named in the indictment. The photographs were not particularly gruesome; they portrayed nothing more than the victims' condition due to the injuries appellant had inflicted. As such, their probative value was not unduly outweighed by their prejudicial effect. *See Young,* 283 S.W.3d at 875. Points of error twenty-five and twenty-six are overruled.

In point of error twenty-seven, appellant claims that the trial court erroneously overruled his objection that the State's closing argument was "outside the scope of guilt/innocence" and was therefore improper. He asserts that the State's argument was intended to prejudice the jury against him. He further asserts that the argument was "manifestly improper and extreme in nature" and injected new and harmful facts into the trial.

In relevant part, the record contains the following argument, objection, and ruling:

[PROSECUTOR]: Y'all can remember the evidence that you heard yesterday, Monday. He took those kids down there and he knew what he was going do, and he told them to sit down.

What did he tell them? Put your head down in the water and act like you are swimming. And that's when he took his hands and he put them on each kid and he held their head[s] under the water. Can you imagine what that must have felt like? What were those kids thinking?

[DEFENSE COUNSEL]:  Judge, again, I'm going to object again.  This entire argument is now outside the scope of guilt/innocence and we're going to object to it at this phase of the trial.

THE COURT:  I will overrule the objection.

Arguably, the prosecutor's questions asking jurors if they could imagine what the children were feeling and thinking directed the jury's attention to a matter that was not relevant to appellant's guilt or innocence.  However, the jury had heard appellant's own statement to the police in which he described Elijah crying for his mother, Naim asking appellant not to kill them, and Naim kicking when appellant held him down.  Therefore, the prosecutor's question arguably invited a reasonable deduction from the evidence.  *See, e.g., Berry v. State,* 233 S.W.3d 847, 860 (Tex. Crim. App. 2007).  Contrary to appellant's position, the question did not inject new and harmful facts into the trial.

The prosecutor's argument was, at most, mildly improper.  *Cf. Martinez v. State,* 17 S.W.3d 677, 693 (Tex. Crim. App. 2000).  Further, the evidence supporting appellant's conviction was exceptionally strong even absent this argument.  *See Freeman v. State,* 340 S.W.3d 717, 728-29 (Tex. Crim. App. 2011).  We find that the error, if any, did not affect appellant's substantial rights.  *See id*.  Point of error twenty-seven is overruled.

## PUNISHMENT PHASE

In point of error twenty-eight, appellant claims that the trial court erroneously overruled his objection to a CPS investigator's testimony concerning her conversation with appellant.  Specifically, he complains that a CPS investigator, Pamela Womack, and

a CPS case worker, Eduardo Beale, interviewed appellant while he was in jail without providing *Miranda*[7] warnings.[8]  Citing *Wilkerson v. State,*[9] appellant acknowledges that police officers and CPS workers "generally run on separate, parallel paths."  He argues, however, that the paths of CPS and the police converged in this case in such a way that they were investigating the criminal offense in tandem, and therefore *Miranda* warnings and Article 38.22 compliance were required.  He submits that the CPS employees who interviewed him had become agents of the State.  Therefore, appellant reasons, the trial court erred by admitting the complained-of testimony.

"Although state employment clearly makes a person an 'agent of the State,' that label does not, by itself, make the person an 'agent of the State' for the purpose of defining 'custodial interrogation.'"  *Wilkerson,* 173 S.W.3d at 528.  The law does not presume that a CPS worker is an agent of the police or prosecutor.  *Id.* at 529-30.  The person alleging the agency relationship has the burden of proving it.  *Id.* at 529.  We examine the entire record to determine whether the investigative paths of CPS and the police converged in a particular case.  *Id.* at 530.

The record does not reflect that Womack and Beale were acting as "instrumentalit[ies]" or "conduit[s]" for the police or prosecution when they interviewed appellant.  *See Wilkerson,* 173 S.W.3d at 530.  Womack testified that she interviewed

---

[7]  *Miranda v. Arizona,* 384 U.S. 436 (1966).

[8]  Beale did not testify at trial.

[9]  173 S.W.3d 521, 527 (Tex. Crim. App. 2005).

appellant as part of a CPS investigation to determine the placement of appellant and Kametra's surviving child, Jeremiah. Womack stated that she did not speak to law-enforcement officials about the case before she interviewed appellant, and she did not know whether Beale had done so. *See id.* She acknowledged that CPS would share information from its investigations with law enforcement if requested to do so. However, this fact alone did not transform her into an agent of law enforcement. *See id.* at 533.

Appellant did not meet his burden of showing that the CPS interview amounted to a custodial interrogation. Therefore, the trial court's decision to admit Womack's testimony over appellant's objection did not constitute an abuse of discretion. *See Berry,* 233 S.W.3d at 856. Point of error twenty-eight is overruled.

In point of error twenty-nine, appellant asserts that the trial court erroneously overruled his objection to State's Exhibit 173, "a purported judgment of misdemeanor offense of evading arrest in Cause No. M97-57574," because there were no identifying fingerprints on the judgment "to legally tie" the conviction to him. He reasons that, without identifying evidence tying the document to him, the jury could not find beyond a reasonable doubt that he committed the extraneous offense. At trial, defense counsel objected to the "lack of a predicate and failure to establish correlation between the exhibit and the Defendant."

To establish that appellant had been convicted of a prior offense, the State had to prove that the prior conviction existed and that appellant was linked to it. *See Flowers v. State,* 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). The State was not required to prove

these elements by any specific mode of proof. *See id.* The State could prove these elements in a number of different ways, including documentary proof that contained sufficient evidence to establish them. *See id.* at 921-92. The trier of fact looks at the totality of the admitted evidence to determine if these two elements are proven. *Id.* at 923.

In this case, the record reflects that State's Exhibits 172 and 173 were certified copies of judgments and court records in consecutive case numbers reflecting that someone with appellant's name, date of birth, address, and physical description was convicted of burglary of a vehicle and evading arrest. The offense dates were the same and the judgments were entered on the same date. Exhibit 172, the judgment pertaining to burglary of a vehicle, contained appellant's fingerprints, but Exhibit 173, which pertained to a conviction for evading arrest, did not. Considering the totality of the evidence, the fact finder could view the identifying information contained in State's Exhibit 173 in conjunction with the identical identifying information in Exhibit 172, plus the additional fingerprint evidence contained in that exhibit, and determine that a prior conviction for evading arrest existed and that appellant was the person convicted. *See id.* at 923-24. Point of error twenty-nine is overruled.

In point of error thirty, appellant asserts that the trial court erroneously overruled his objection that Officer Chris Havens testified from a document not in evidence. In point of error thirty-one, appellant complains that the trial court erred when it allowed Havens to testify to appellant's personal identifying characteristics after the State

improperly refreshed Havens's recollection with a police report made by a third party. Appellant states that defense counsel's objection "was continuously overruled." Appellant briefs these points together.

Appellant refers to Havens by name, but he provides a record cite to Dallas Police Lieutenant Harold Andrews's testimony. On this basis, we could reject this claim as inadequately briefed. TEX. R. APP. P. 38.1. In the interests of justice, however, we will address it on the merits.

We infer from our comparison of appellant's brief to the trial record that appellant intends to challenge the admission of Andrews's testimony rather than Havens's testimony. We draw this inference because the record of Havens's testimony does not support appellant's assertion that defense counsel's objections were "continuously overruled," but the record arguably does support appellant's assertion that his objections to Andrews's testimony were "continuously overruled."

The record reflects that Andrews reviewed the police report of the extraneous offense in question before he testified. Andrews testified that he remembered hearing a call to respond to a burglary of a vehicle at about 4:00 a.m. on July 27, 1994. Andrews personally did not respond to the scene of the burglary. Rather, he heard the description of the suspects and, based on that description, he looked for suspects in the area. He "found Mr. Muhammad" and took him back to the scene of the offense, where one of the complainants identified him.

Andrews testified that the officers who responded to the scene prepared the written

police report.  However, Andrews also testified that he would have asked the suspect for his name and date of birth when he detained him because that was "standard procedure." The prosecutor asked Andrews if he "remember[ed] the identifying information on Mr. Muhammad."  Andrews responded that he remembered that the suspect was fifteen years old and his name was Naim Muhammad, but other than that, Andrews did not recall the details.  The prosecutor invited Andrews to refresh his memory by reviewing the police report and then asked:

Q. Does it have a date of birth for that?

A. 5-3 of 1979.

Q. Is he a black or white male?

A. He is a black male.

At that point, defense counsel objected that Andrews was testifying from a report that was not in evidence.  The trial court ruled that the witness could refresh his memory and testify.  Counsel then stated that Andrews's testimony was admissible only if the report refreshed his memory and did not provide him with information:  "If he just reads it and he says that's what it says, that is not refreshed testimony, Judge."  Defense counsel then took Andrews on voir dire.  Counsel asked Andrews whether, at the time of trial, he had personal knowledge of the information contained in the report.  Andrews responded that he did not understand the question.

Defense counsel then posed a question that involved a double negative:  "Other than reading and right now saying what the document says, there is no way it is not going

to refresh your actual recollection so that you can state independently that information contained on that document is accurate, can you?" Andrews's one-word answer, "Correct," did not resolve the matter of whether the document refreshed his recollection or, alternatively, provided him with new information.

After this exchange, counsel renewed his objection, but he did not obtain a new ruling. The prosecutor then resumed her questioning. She asked Andrews if he obtained the suspect's name when he detained him. Andrews reiterated that he did not recall specifically, but he was sure that he had done so, because "[t]hat's just standard procedure." The prosecutor again asked Andrews if he had reviewed the report and if he knew that the person he detained was Naim Muhammad. The defense again took Andrews on voir dire, leading to the following exchange:

> Q. Officer, other than the fact that your testimony to this jury so far has been you were called to the scene, you snatched up the fellow, you carried him back and you dropped him off. That's, basically the extent of your involvement in this incident, is it not?
>
> A. More or less.
>
> * * *
>
> A. I'm sure when I first approached him I got his name and date of birth, that kind of information from him. I do that with everyone that I come in contact with.
>
> Q. There is nothing in these documents that are before you, at this point in time, there is not a single document here that you prepared this? [sic]
>
> A. That I actually wrote, no, sir.
>
> Q. Right. And so, they are not even asking you to refresh your recollection

from a document that you prepared.  They are asking you to refresh your recollection from a document that somebody else prepared?

A. Yes, sir.

Counsel again objected, and his objection was overruled.  The prosecutor then continued her direct examination, again eliciting Andrews's testimony that he collected information about the suspect, including his name and date of birth.  Defense counsel again objected, arguing that Andrews lacked personal knowledge of the answers to the prosecutor's questions.  The court overruled the objection, and defense counsel again took Andrews on voir dire:

Q. Is there anything on that document, sir, that you prepared?

A. No, sir.

Q. Is there anything on that document, sir, that was prepared at your direction or in your presence?

A. At my direction?

Q. Or in your presence.

A. Not in my presence, no.

Q. You have no personal information or personal knowledge as to any of the information contained on that document, do you, sir?

A. Yes, sir, I do.

Q. Other than the fact that it describes you as bringing somebody back from the scene?

A. Correct.

Q. Other than that –

A. At the particulars of the situation at the time, yeah.

Q. Right. But not as to the identification. Not as to the identifying factors contained on that report; that's correct, is it not?

A. As I said before I am sure I got that information.

Q. That's a yes or no, sir. That's a yes or no.

A. Okay. No.

Counsel again objected, the court again overruled the objection, and the prosecutor again elicited Andrews's testimony that he obtained the suspect's name and date of birth. Defense counsel again objected that Andrews did not have personal knowledge of appellant's identifying information. The prosecutor responded that it was appropriate for Andrews to refresh his memory by reviewing the police report "because he was there that day." Defense counsel argued that it was improper for a witness to refresh his recollection from a document that was not prepared in the witness's presence or at his direction. The trial court overruled the objection and granted defense counsel a running objection to Andrews's testimony. The prosecutor again elicited Andrews's testimony naming the suspect as Naim Muhammad and providing his date of birth as May 3, 1979.

Regardless of whether the prosecutor properly used the police report to refresh Andrews's recollection, Andrews had already testified to the suspect's name and date of birth before defense counsel made his initial objection. As to this portion of Andrews's testimony, counsel's belated objection did not preserve error. *See* TEX. R. APP. P. 33.1; *Lagrone v. State,* 942 S.W.2d 602, 618 (Tex. Crim. App. 1997) ("If a defendant fails to

object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and error is waived."). Moreover, even if we assume that the trial court erred by overruling appellant's subsequent objections, appellant cannot show that the trial court reversibly erred because the same information – the suspect's name and date of birth – was already before the jury. *See Coble,* 330 S.W.3d at 282. Points of error thirty and thirty-one are overruled.

In point of error thirty-two, appellant complains that the trial court erroneously overruled his objection that Garland Police Officer Brandon Hernandez did not have personal knowledge of the information he provided during his testimony because he read the information from a report. Appellant avers that the prosecutor did not properly use the writings to refresh Hernandez's recollection. Specifically, appellant contends that the prosecutor had Hernandez testify from a document that was not in evidence in order to enter otherwise inadmissible information into evidence.

Hernandez's testimony provided an account of his and other officers' response to a burglary alarm at 3:30 a.m. on July 4, 1999. When police officers responded to the scene, they discovered a car parked in a cul-de-sac with its headlights turned off and its engine running. The car sped away as an officer approached it. Officers pursued and stopped the car. They discovered a loaded shotgun and a screwdriver in the car, as well as a bag of marijuana outside the car that appeared to have been thrown from the car. All three of the car's occupants were arrested. One of the car's occupants identified himself as Naim

Muhammad. He provided a birth date that enabled officers to confirm his identity against police records.

Defense counsel then objected that Hernandez's testimony was hearsay. The trial court overruled the objection and allowed defense counsel to voir dire Hernandez, who acknowledged that he did not recall whether he personally had interviewed appellant and verified his identifying information against police records. Counsel then objected that Hernandez lacked personal knowledge of the events about which he had testified. The trial court overruled the objection. On cross-examination, defense counsel elicited Hernandez's testimony that appellant had been a passenger in the back seat of the car.

Whether or not the prosecutor properly used the police report to refresh Hernandez's memory, appellant's belated objection did not preserve error. *See* TEX. R. APP. P. 33.1; *Lagrone,* 942 S.W.2d at 618. Point of error thirty-two is overruled.

In point of error thirty-three, appellant asserts that the trial court erroneously overruled his objection to the testimony of Dallas Police Officer David Solomon concerning the circumstances under which he arrested appellant. Appellant appears to argue that Solomon's reference to a suspected attempted automobile theft was prejudicial because appellant was cleared of any involvement in that offense.

Solomon's testimony was offered to connect appellant to a burglary of a habitation offense that had been described in previous testimony. Solomon referred to the attempted automobile theft in the course of explaining how and why he arrested appellant for the burglary. Specifically, Solomon testified that he stopped the car in which appellant was

riding after a witness informed Solomon that the car resembled one that was observed during an attempted automobile theft. Based on the witness's statement, Solomon detained appellant and the car's other occupants, but all of them were cleared of any involvement in the attempted automobile theft. However, Solomon discovered that appellant had outstanding warrants for burglary and arrested him on that basis.

Assuming without deciding that the trial court erred in admitting Solomon's testimony concerning the attempted automobile theft, appellant was not harmed. *See Coble,* 330 S.W.3d at 280 (noting that if the improperly admitted evidence did not influence the jury or had but a slight effect upon its deliberations, such non-constitutional error is harmless). Solomon testified that appellant was cleared of any involvement in that offense. Further, the trial court included in the written jury charge an instruction that the jury could consider extraneous offenses only if the offenses had been proven beyond a reasonable doubt:

> You are instructed that if there is any evidence before you in this case regarding the Defendant having committed an offense or offenses other than the offense alleged against him in the indictment, you cannot consider this evidence for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the answers to the special issues.

We presume that the jury followed this instruction. *See Coble,* 330 S.W.3d at 292. Solomon's testimony concerning the attempted automobile theft did not prove beyond a reasonable doubt that the offense was committed and that appellant committed it; rather, Solomon expressly stated that appellant was cleared of any involvement. Therefore, we

presume that the jury disregarded this evidence. We conclude that any error did not influence the jury or had but a slight effect. *See id.* at 280. Point of error thirty-three is overruled.

In point of error thirty-four, appellant asserts that the trial court erroneously overruled appellant's objection that Warden Melody Nelson's[10] testimony about the types of weapons found in prison was not particularized to appellant. He avers that Nelson's testimony and the display of weapons before the jury were not relevant because the defense had not called anyone to testify about prison conditions and so the State had no reason to offer general testimony about acts committed by other inmates. He also complains that Nelson's testimony and the weapons display "could only be based on hearsay." He argues that admitting this evidence denied him a fair trial in violation of his right to due process.

At trial, defense counsel objected that Nelson's testimony describing the types of objects that could be made into weapons was not relevant because there had been no showing of any nexus between that testimony and appellant. The prosecutor responded that the jury should be allowed to understand what the prison system was like; he clarified that he was not saying that appellant made the weapons. The trial court overruled the objection. Nelson continued to testify, describing additional items that could be made into weapons. Nelson showed the jury some weapons that had been found in prisons.

---

[10] The State's appellate brief lists Warden Nelson's first name as "Melodye," but the reporter's record lists it as "Melody." We adopt the court reporter's spelling.

Defense counsel did not specifically object to this display.

Appellant did not preserve his hearsay complaint because he did not object to Nelson's testimony on this basis at trial. TEX. R. APP. P. 33.1. Further, to the extent that he attempts to add a specific complaint about the weapons display, he did not preserve this complaint with a trial objection. *Cf. Roberts v. State,* 220 S.W.3d 521, 532 (Tex. Crim. App. 2007) (general objection to testimony, advanced before testimony was heard, did not place the trial court on notice that appellant would find particular testimony objectionable); *Ladd v. State,* 3 S.W.3d 547, 572 (Tex. Crim. App. 1999) (trial court was not required, in the face of a global objection, to sift through an exhibit and segregate the admissible portions from the inadmissible portions). Therefore, we consider only appellant's complaint that Nelson's testimony about weapons in prisons was not relevant because it was not connected to appellant.

Nelson's testimony described the conditions that appellant would face if he were sentenced to life in prison, including the potential for violence. Her testimony, including her description of weapons that inmates had made, was relevant because it informed the jury's assessment of the probability that appellant would commit acts of violence in prison society. *See Coble,* 330 S.W.3d at 269. The trial court did not abuse its discretion by admitting Nelson's testimony. Point of error thirty-four is overruled.

In point of error thirty-five, appellant complains that the trial court erroneously denied his motion for a hearing to make a threshold inquiry into whether the State could present sufficient evidence of extraneous offenses and bad acts before allowing the State

to present such evidence to the jury. Specifically, appellant complains that, if the trial court had determined the threshold admissibility of extraneous-offense evidence before allowing the State to present it to the jury, the trial errors raised in points of error forty-two, forty-three, and forty-four would have been prevented.[11]

Appellant further argues that the court's refusal to make a preliminary admissibility determination resulted in prejudice because the State presented testimony from police officers who made unsubstantiated allegations of appellant's bad conduct. He asserts that the trial court's refusal to exclude the State's "anecdotal" and "minimal" evidence of extraneous bad acts resulted in "a series of repetitive errors on the State's . . . attempted use of improper extraneous evidence."

The record reflects that, during a pre-trial discussion of appellant's "Motion for a Pre-Trial Hearing as to the Admissibility of Each Extraneous Offense o[r] Bad Act," appellant expressly asked the trial court to carry his motion for a pre-trial hearing until a later time. Defense counsel stated, "If the State is intending to offer anything other than live witnesses, we have some confrontation issues and some *Crawford*[12] issues that would certainly apply to the State's intent to offer [proof of extraneous acts] by way of a business record." However, in light of the prosecutor's stated intent to present

---

[11] Points of error forty-two, forty-three, and forty-four concern the sufficiency of the future-dangerousness evidence and the constitutionality of Article 37.071. We suspect that appellant did not intend to refer to these points of error, but we decline to speculate.

[12] *Crawford v. Washington,* 541 U.S. 36 (2004).

extraneous-act evidence through live testimony, counsel asked the trial court to "hold the motion at this time for further consideration, if it comes up."

The trial judge advised defense counsel to let him know if the defense had an objection during the proffer of evidence, stating that the court would rule on it at that time. Thus, to the extent that appellant complains about the trial court's pre-trial handling of his motion, he did not preserve error, and he is estopped from seeking appellate relief. *See* TEX. R. APP. P. 33.1; *see also Woodall v. State,* 336 S.W.3d 634, 644 (Tex. Crim. App. 2011) ("The law of invited error provides that a party cannot take advantage of an error that it invited or caused.").

After the guilt-or-innocence phase and before the punishment phase, defense counsel again discussed the motion. Counsel requested that, prior to the introduction of any testimony concerning extraneous bad acts, the trial court make a threshold determination that there was competent proof that appellant committed the bad act. Counsel also requested that the trial court provide an oral jury instruction after the presentation of evidence of each extraneous offense, to the effect that the jury could not consider such evidence unless it found beyond a reasonable doubt that appellant had committed the extraneous offense. Further, defense counsel requested that the trial court include a similar written jury instruction in the jury charge. The trial court denied the motion.

When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. Rule 104(b). The trial

court may admit the proposed evidence on the condition that the proof be introduced later. *Id.*; *see also Moore v. State,* 700 S.W.2d 193, 205 (Tex. Crim. App. 1985) (noting that the trial court has the discretion either to determine the merits of motions concerning the admissibility of evidence during the trial itself or to set a hearing to determine such motions).

In capital cases in which the State seeks the death penalty, Article 37.071, section 2(a), governs the admissibility of extraneous-act evidence offered at punishment. *Hughes v. State,* 24 S.W.3d 833, 843 (Tex. Crim. App. 2000). The trial judge has wide latitude in admitting or excluding such evidence. *Kemp v. State,* 846 S.W.2d 289, 307 (Tex. Crim. App. 1992). "Before extraneous offenses may be introduced during the punishment phase of a capital murder trial, the State must 'clearly prove' to the trial court that an offense was committed and that the accused was the perpetrator." *Burks v. State,* 876 S.W.2d 877, 909 (Tex. Crim. App. 1994). Nevertheless, "evidence should not be excluded merely because its relevance may depend upon the production of additional evidence at a later point in the trial or because its probative strength is alone insufficient to prove a significant fact." *Fuller v. State,* 829 S.W.2d 191, 197 (Tex. Crim. App. 1992). "[O]nce evidence is deemed admissible, the jury is the ultimate judge of the credibility of witnesses and of the weight to be given their testimony." *Id.* We evaluate the trial court's ruling solely to determine whether it was within the zone of reasonable disagreement. *Chamberlain v. State,* 998 S.W.2d 230, 235 (Tex. Crim. App. 1999).

The trial court had the discretion either to hold a separate hearing concerning the

admissibility of the State's extraneous-offense evidence or to determine the admissibility of this evidence during the trial. *See Moore,* 700 S.W.2d at 205. The court acted within this discretion when it denied appellant's motion to hold a separate hearing before the punishment phase.

After several State's witnesses testified about extraneous offenses and bad acts during the State's punishment case-in-chief, the trial court held another hearing outside the jury's presence on appellant's motion. Defense counsel argued that, by presenting these witnesses, the State had offered evidence that was not admissible against appellant. Counsel complained that the testimony of police officers who did not independently recall events, but who reviewed arrest reports and then testified about the contents of those reports, was inadmissible because such testimony was not evidence that would lead a jury to find someone guilty of the alleged extraneous offenses beyond a reasonable doubt. Counsel also argued that testimony merely referring to the arrest report for the suspect's name and date of birth – which were the same as appellant's – was insufficient to tie appellant to those offenses. The trial court disagreed and again denied appellant's request for a threshold hearing on extraneous-offense evidence. The trial court instructed the State to "tie up" extraneous-offense testimony in which appellant had not been identified as a suspect, but the court also ruled that, with respect to the extraneous-offense evidence that had already been presented to the jury, the State had made a clear showing as required by law.

The trial court acted within its discretion by declining to hold a threshold hearing.

*See Fuller,* 829 S.W.2d at 198 ("[A] trial judge cannot err in most cases by overruling a relevancy objection so long as the challenged evidence might be 'connected up' before the end of trial."). The court's determination that the State's evidence clearly proved that the offenses were committed and that appellant was the perpetrator was also within the zone of reasonable disagreement. *See id.* at 197 (finding no error when trial court overruled relevancy objection "pending the fact that" the prosecutor would introduce evidence sufficient to fulfill a condition of fact; "Clearly, the parties must be allowed to develop their cases one step at a time.").

Defense counsel re-urged the motion again after additional State's witnesses testified about extraneous offenses. Counsel argued that, by having officers with no independent recollection of events testify from arrest reports, the State was effectively proving up extraneous offenses through business records. Counsel complained specifically of the extraneous-offense testimony of one police officer who acknowledged that he had no independent recollection of events even after reviewing the arrest report. Defense counsel asserted that such testimony was not competent evidence. The trial court expressed the view that the complained-of witness had been unprepared, but the court declined to instruct the jury that any previously presented extraneous-offense testimony was not competent evidence.

The trial court did, however, grant appellant part of the relief he requested in his motion. Before the State presented any additional extraneous-bad-act evidence, the court instructed the jurors orally that, if they did not believe that the evidence of an offense

proved beyond a reasonable doubt that the offense had been committed and that appellant committed it, then they should not consider the evidence for any purpose. As noted in point of error thirty-three, the court also provided a similar instruction in the written jury charge.

Other than his broad assertions that the State's witnesses' testimony concerning appellant's bad acts was "anecdotal, minimal," and unsubstantiated, appellant does not explain how or why this testimony was inadmissible. We decline to make his argument for him. *See* TEX. R. APP. P. 38.1; *Ladd,* 3 S.W.3d at 574. Further, by giving the requested jury instructions, the trial court provided a safeguard against the possibility that the jurors would consider extraneous-offense evidence even if they did not believe that the evidence clearly proved the offense and appellant's commission of it. Appellant has not overcome the presumption that the jury followed the trial court's oral and written instructions. *See Gamboa v. State,* 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). Point of error thirty-five is overruled.

In point of error thirty-six, appellant complains that the trial court erroneously overruled his motion for a mistrial after the prosecutor presented a witness to testify about an extraneous bad act but then withdrew the witness's testimony after appellant objected to the lack of notice.

The record reflects that the prosecutor called Officer Ryan Swain to testify that on July 18, 2010, while responding to a call about a suspicious person, he encountered appellant. Defense counsel objected that the offense about which Swain would testify

had been omitted from the State's Rule 404(b) notice. After reviewing the notice, the prosecutor confirmed that the State had not given notice of the offense at issue and agreed that the State would not present any more testimony from Swain. Defense counsel complained that Swain's incomplete testimony would cause the jury to speculate about appellant's bad conduct that led to the suspicious-person call. Counsel asked the trial court to instruct the jury that it should not consider any of Swain's statements for any purpose. Counsel also asked for a mistrial. The trial court instructed the jury to disregard Swain's testimony, but overruled the request for a mistrial.

The trial court's instruction to disregard Swain's testimony was sufficient to cure any harm. *See Coble,* 330 S.W.3d at 292. Further, the written jury charge instructed the jury to disregard any extraneous-offense evidence that did not prove the offense beyond a reasonable doubt, and we presume that the jury followed this instruction. *See Gamboa,* 296 S.W.3d at 580. Given the evidence of appellant's other extraneous offenses, the trial court's instruction to disregard, and the inconsequential nature of Swain's testimony, the trial court did not abuse its discretion in denying appellant's motion for a mistrial. Point of error thirty-six is overruled.

In point of error thirty-seven, appellant asserts, "The trial court erred in overruling appellant's objection that the State was allowed to present evidence that an arrest of appellant was based on a warrant for an alleged burglary of a motor vehicle that he was not involved. [sic]" We surmise that this point of error is a restatement of point of error thirty-three. Appellant excerpts part of the record of Solomon's testimony during which

defense counsel objected that the State failed to give the defense proper notice under Rule 404(b). Appellant then cites two non-capital cases in support of his assertion that the jury could not find beyond a reasonable doubt that he committed the extraneous offense. Finally, appellant submits that the trial court erred in admitting this evidence and that the error had a substantial or injurious effect on the punishment verdict. Because appellant does not apply the law to the facts of the case, we reject this point of error as inadequately briefed. *See* TEX. R. APP. P. 38.1; *see also Linney v. State,* 413 S.W.3d 766, 767-68 (Tex. Crim. App. 2013). Point of error thirty-seven is overruled.

In points of error thirty-eight and thirty-nine, appellant complains that the trial court's erroneous rulings allowed the State to cross-examine two testifying mental-heath experts on matters outside their expertise. In point of error thirty-eight, appellant asserts that the trial court erroneously overruled his objection to the State's cross-examining Dr. Kelly Gray-Smith about her opinion that appellant had antisocial personality disorder ("ASPD"). In point of error thirty-nine, appellant asserts that the trial court erroneously overruled his objection to the State's cross-examining Dr. Gilbert Martinez about the symptoms of ASPD.

Appellant briefs points of error thirty-eight and thirty-nine together. He argues that the trial court's rulings permitted the State to require defense witnesses on cross-examination to testify "beyond the scope" of their "expertise or engagement for the case at bar." He complains that the State was allowed to convert the witnesses into State's witnesses by eliciting opinions or information that appellant "had all the criteria for a

diagnosis of Anti Personality Disorder [sic] in order to convince the jury that he was a future danger."

The record reflects that Martinez testified before Gray-Smith. Martinez informed the jury that he was a clinical neuropsychologist who evaluated the mental functioning of people suspected of having neurological disorders. Typically, he evaluated and treated people with head injuries or strokes. In this case, he "conduct[ed] a neuropsychological examination of [appellant's] intelligence and what's called his cognitive functioning; in other words, his mental functioning, his memory, attention, reasoning and judgment and so forth." In addition to reviewing appellant's academic, juvenile, and medical records, Martinez met with appellant for five hours to conduct an interview and administer a battery of psychological tests.

Based on the results of this examination, Martinez diagnosed appellant with a "mild neurocognitive disorder," which could interfere with a person's thinking, reasoning, impulse control, and inhibition. Martinez testified that a person with this disorder might have deficits in behavioral and emotional control, as well as problems understanding social situations. Martinez also diagnosed appellant with borderline intellectual functioning. He noted that appellant's history revealed "Epilepsy, Possible Concussion/Mild Head Injury reported in 2009, and Head Injury, auto crash in 1983." Martinez observed that the medication used to treat epilepsy could contribute to cognitive deficits. Prolonged drug abuse could also contribute to intellectual and executive-functioning deficits.

During cross-examination, Martinez acknowledged that he was not certain that appellant had a brain injury, but he noted that appellant's test scores were "highly consistent" with a childhood brain injury. Martinez also acknowledged that "[i]mpulsivity is one of the diagnostic criteria for antisocial personality disorder," as is "a failure to conform to society's norms and general rules and regulations of society." Martinez further acknowledged that a history of lying or conning people for personal gain or pleasure, and difficulty planning ahead, could also be symptoms of ASPD.

Defense counsel then objected that "[a]ll of these questions here are clearly outside of the referral question," and that Martinez had "not been asked to do any kind of psychological assessment in regards to any ASPD factors." Counsel asserted that Martinez was asked to evaluate and testify specifically concerning appellant's cognitive deficits. The prosecutor responded that Martinez "made an Axis II diagnosis and that included antisocial personality disorder." The trial court overruled the objection.

The prosecutor went on to note that, as part of Martinez's evaluation of appellant, Martinez had reviewed a 1994 psychological report that included a diagnosis of conduct disorder. The prosecutor asked Martinez if that was "the same as a sociopath." Martinez declined to answer, saying that he was not an expert in ASPD and he did not want to give an opinion outside his area of expertise. The prosecutor continued to press Martinez for an opinion as to whether appellant had ASPD, but Martinez repeatedly declined to provide one. Martinez explained that, in order to diagnose someone with ASPD, he would have conducted a different type of assessment that included administering

personality tests and psychological tests "that look at that." In this case, Martinez had "only administered cognitive and intelligence tests."

On redirect, defense counsel elicited Martinez's testimony emphasizing that his area of expertise did not include personality disorders and that his diagnosis was limited to appellant's intellectual and cognitive functioning. Martinez observed that some of the traits that the prosecutor associated with personality disorders were also associated with cognitive deficits.

Appellant failed to preserve his complaint concerning the testimony in which Martinez generally acknowledged some of the diagnostic criteria for ASPD because defense counsel did not object until after the prosecutor elicited this testimony. *See* TEX. R. APP. P. 33.1. After defense counsel objected, Martinez repeatedly declined to give an opinion as to whether appellant had ASPD. Therefore, with respect to the part of appellant's complaint that was preserved by objection, Martinez did not testify outside his area of expertise. Point of error thirty-nine is overruled.

Later, Gray-Smith, a psychologist with a specialty in school psychology, testified about chronic academic failure and emotional disturbance in children. She observed that the "externalizing behaviors" that often arise from emotional or academic disabilities can be mislabeled as choice-based "bad behavior," with the result that a child who has such disabilities and exhibits such behavior does not receive appropriate support and intervention. Without such support, the child does not learn coping skills and is unable to regulate his emotions and respond to stressful situations "in a controlled way." Such a

child is likely to exhibit chronic academic and behavioral problems.

Gray-Smith had reviewed a number of appellant's records in forming her opinion and preparing her report. These included appellant's school records, which she said reflected very early academic failure and no effective intervention. Although appellant's school records from fourth and fifth grades included a mention of special education, Gray-Smith opined that, based on appellant's early poor performance, the school should have provided him with help in the first or second grade. She noted that appellant's school records showed that his behavioral and academic problems worsened after sixth grade, but he received no intervention.

Gray-Smith explained that if a child had behavioral problems but received no intervention before he was nine years old, his prognosis would be very poor with respect to preventing adolescent behavioral problems. Beyond the age of nine, a child's behavioral problems would be classified as a conduct disorder and generally result in suspension or expulsion. Such disciplinary actions would disconnect the child from his school and important sources of help and support. In addition, a child whose school records indicated that he had oppositional defiant disorder and whose juvenile records included a diagnosis of conduct disorder, but who received no intervention, would typically be diagnosed with ASPD as an adult. Gray-Smith testified that such a person would likely end up unemployed or in jail.

On cross-examination, Gray-Smith acknowledged that most children with chronic school failures do not go on to commit violent offenses such as capital murder. The

prosecutor noted that Gray-Smith concluded "throughout [her] report" that appellant had ASPD, and Gray-Smith agreed with that characterization. She declined to say that she had diagnosed appellant with ASPD, but she acknowledged that she had formed an opinion. She stated that she was familiar with behavioral disorders. Based on appellant's prior conduct-disorder diagnosis and his other criminal offenses, Gray-Smith believed that appellant had ASPD.

On redirect, Gray-Smith elaborated on the difference between a diagnosis and an opinion. She stated that the psychologists' licensing act and ethical guidelines mandated that a psychologist should not go beyond his or her area of expertise in making a diagnosis, even if he or she might form an opinion. She also stated that a great majority of inmates in the penitentiary have the traits of ASPD, so an opinion that a person has ASPD is not a meaningful predictor of his future dangerousness in prison.

On recross, the State asked Gray-Smith about the symptoms of ASPD listed in the Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition ("DSM-IV"). Gray-Smith acknowledged that people with ASPD typically "have a reckless disregard for the safety of others." After the prosecutor asked Gray-Smith whether a failure to conform to norms was also characteristic of a person with ASPD, defense counsel objected that the prosecutor was improperly attempting to associate all of the specific symptoms of ASPD to appellant, when Gray-Smith had not interviewed or examined appellant and could not attribute specific traits to him. The prosecutor responded that Gray-Smith could discuss the symptoms of ASPD because she had given an opinion that appellant had ASPD. The

trial court overruled the objection.

The prosecutor then asked generally whether a person with ASPD would: have difficulty conforming to social norms and rules; lie in order to get what he wanted; be impulsive; and fail to plan ahead. Gray-Smith stated that a person with ASPD would have some of those symptoms but not necessarily all of them. The prosecutor continued listing the criteria for ASPD, and Gray-Smith continued acknowledging that they were traits typical of ASPD: aggression and repeated fights or acts of violence; inability or unwillingness to meet continuing obligations and responsibilities; inability or unwillingness to show remorse; rationalizing harm caused to others; violating others' rights; and a diagnosis of conduct disorder before the age of fifteen.

Appellant did not object to Gray-Smith's ASPD testimony until after she had opined that appellant had ASPD and acknowledged that one of the traits identified by the prosecutor was typical of ASPD. *See* TEX. R. APP. P. 33.1; *see also Luna v. State,* 268 S.W.3d 594, 604 (Tex. Crim. App. 2008). Further, appellant's trial objection – that Gray-Smith had not interviewed or examined appellant and therefore could not specifically attribute particular traits of ASPD to him – does not comport with his complaint on appeal, which is that Gray-Smith testified outside her area of expertise. *See* TEX. R. APP. P. 33.1; *see also Gallo,* 239 S.W.3d at 768. Therefore, appellant did not preserve this portion of his argument.

To the extent that appellant argues that Gray-Smith's testimony that appellant met all the criteria for ASPD went beyond the scope of her pretrial preparations, his argument

fails to state a claim for relief. Appellant mischaracterizes Gray-Smith's testimony because Gray-Smith did not expressly attribute particular ASPD traits to appellant. Instead, she testified generally about the traits of a person with ASPD. *See, e.g., Tillman v. State,* 354 S.W.3d 425, 439-40 (Tex. Crim. App. 2011) (applying the reasoning of *Cohn v. State,* 849 S.W.2d 817 (Tex. Crim. App. 1993), to find that an expert witness's general testimony was sufficiently tied to the facts of the case by other witnesses' testimony). Gray-Smith properly could testify beyond the scope of her pretrial preparations. *See id.* (observing that Rule of Evidence 703 permits an expert to base her opinion testimony on the data and facts made known to her during trial). Point of error thirty-eight is overruled.

In point of error forty, appellant asserts that the trial judge improperly commented on the weight of the evidence when he admonished the jury concerning overnight sequestration. Appellant states that the court's comment that jurors should bring overnight bags with them the following morning, although they probably would not need them, may have led the jury to infer the judge's opinion of the merits of the case. Appellant also asserts that the comment "indirectly coerced [jurors] through the threat of sequestration away from their homes and family to reach a verdict before the end of the day," and denied him due process and a fair trial by a fair jury. He argues that, because the jury returned a sentence of death, the alleged error was not harmless beyond a reasonable doubt.

The record reflects that, at the end of the presentation of evidence on May 22,

2013, the trial court released the jury for the day. The judge explained that it was almost 3:00 p.m. and that he would keep the jury together once they started deliberations. Rather than providing the jury charge and beginning closing arguments that afternoon, the court would be in recess until the jury returned at 9:00 the next morning. Defense counsel then reminded the judge about the "future instructions," which prompted the judge to inform jurors that the bailiff would give them some instructions before they left for the day:

> I've asked [the bailiff] to have you, in the morning, bring with you a change of clothes just in case. I don't think you are going to need it, but just in case you do not finish your deliberations tomorrow, then I will have to sequester you as long as you are in deliberations, or before you return to court with a verdict on punishment, then I will have to keep y'all together. And so – just bring a change of clothes with you.

Defense counsel requested a mistrial, stating that the court had commented on the weight of the evidence by indicating to the jury "that there is nothing in this case worthy of a deliberate process on it." Counsel added, "we are prejudiced beyond belief that the Court would make that comment in front of the jury." The trial judge disagreed with counsel's view that his statement was a comment on the weight of the evidence; rather, the judge stated that he had explained to the jurors that he was planning to resume the case in the morning so that they would have a full day to deliberate, but if they did not reach a verdict, then they would be prepared for sequestration. The court denied the motion for mistrial.

We need not address the merits of appellant's current argument that the jury was indirectly coerced through the threat of sequestration because this argument does not

comport with the basis for appellant's motion for mistrial. *See* TEX. R. APP. P. 33.1; *see also Gallo,* 239 S.W.3d at 768. With respect to appellant's argument that the judge's statement was a comment on the weight of the evidence that warranted a mistrial, we note that a trial judge is prohibited from conveying to the jury his personal opinion as to the truth or falsity of any evidence. *See Russell v. State,* 749 S.W.2d 77, 78 (Tex. Crim. App. 1988). In this case, however, the trial judge's comment did not convey such an opinion. The comment conveyed an opinion that the jury probably would not need more than a day in which to deliberate and resolve the punishment special issues, but the comment did not favor either party or single out any particular evidence for the jury's consideration. Further, the comment did not direct the jurors to resolve the special issues quickly. Rather, the comment advised jurors to bring a change of clothes, and, thus, clearly contemplated that they might deliberate for longer than one day.

Assuming for the sake of argument that the trial judge's statement was an improper comment on the weight of the evidence, appellant has not shown reversible error. We afford great deference to the trial judge's decision as to whether a comment on the weight of the evidence warrants a mistrial. *See Pierson v. State,* 426 S.W.3d 763, 773 (Tex. Crim. App. 2014) (quoting *Harrison v. State,* 788 S.W.2d 18, 22 (Tex. Crim. App. 1990)) ("[I]n the context of a declaration of mistrial involving an assessment of the prejudicial impact upon the jury of some impropriety, the trial judge's decision is entitled to great deference."); *see also Coble,* 330 S.W.3d at 292 (holding that a trial judge's denial of a motion for mistrial is reviewed under an abuse-of-discretion standard, and the

ruling must be upheld if it was within the zone of reasonable disagreement).

Though requesting lesser remedies is not a prerequisite to a motion for mistrial, when the movant does not first request a lesser remedy, we will not reverse the court's judgment if the problem could have been cured by a less drastic alternative. *Ocon v. State,* 284 S.W.3d 880, 884-85 (Tex. Crim. App. 2009). Here, the jury instructions that the judge provided the next day cured any harm. *See, e.g., id.* at 885 (noting that jury instructions are among the less drastic alternatives to declaring a mistrial). When the jurors returned to the courtroom the following morning, the trial court instructed them that it would be improper for them to arrive at their answers to the special issues by any method other than a full, fair, and free exchange of opinions. They were also instructed that they should deliberate for as long as they felt was necessary to arrive at their answers to the special issues. Jury instructions should be presumed effective, absent evidence that the jury did not follow them. *Gamboa,* 296 S.W.3d at 580. Appellant has identified no such evidence, and we have found none in our independent review of the record. Point of error forty is overruled.

In point of error forty-one, appellant asserts that the trial court erroneously overruled his objection that the State argued outside of the record during closing argument. Specifically, in the State's final closing argument, the prosecutor drew parallels between Kametra's life and the life of Maya Angelou. The prosecutor advised the jury that Angelou was raped when she was eight years old, had a child when she was seventeen, and was once "a full-grown madam, running a brothel." The prosecutor noted

that Angelou arose from these circumstances to become "Poet Laureate." From this, the State argued that Kametra could also change her life and "be anything she wants to." The trial court overruled defense counsel's repeated objections that this argument was outside the record and injected facts not in evidence. Finally, when counsel objected that the prosecutor could not "argue the life history of people," the court admonished the prosecutor to "[a]rgue the evidence and the law."

Appellant complains that the prosecutor's introduction of information about Angelou's life history was "obviously presented to inflame the minds of the jury with enough prejudice beyond the facts of the case in issue that the jury would return a death verdict in answering the special issues." He asserts that this argument was extreme and manifestly improper because it injected new and harmful facts into the proceeding.

The record shows that before the State's argument, defense counsel's closing argument had attacked Kametra's credibility and character, stating that Kametra's testimony about appellant's previous acts of domestic violence had "escalated" since she first described them to defense counsel. Counsel pointed out that Kametra had cheated on appellant while he was serving a previous jail term. Counsel also described Kametra as a "sophisticated prostitute" running an "internet prostitution scheme." He reminded the jury that, after Kametra left appellant, she developed a $3,000-a-month drug habit. Defense counsel argued that the State wanted to present Kametra as a victim with "no way to get away from [appellant]" because it fit well with the State's theory of the case.

The State avers that the prosecutor's argument was a response to defense counsel's

argument, as well as a summation and reasonable deduction from the evidence. *See Rocha v. State,* 16 S.W.3d 1, 21 (Tex. Crim. App. 2000) (recognizing four areas of permissible jury argument). The State also argues that Angelou's life history was admissible under the "common knowledge" exception to the prohibition against arguing outside the record. *See Nenno v. State,* 970 S.W.2d 549, 559 (Tex. Crim. App. 1998). Specifically, the State asserts, "Angelou is a public figure whose life history is common knowledge."

Although the State's argument describing the facts of Kametra's life was a summation and reasonable deduction from the evidence, the argument describing Angelou's life history was not. Angelou's life history was outside the record. "Common knowledge" does not necessarily encompass the life history of a public figure, and we are not persuaded that Angelou's life history otherwise falls within the "common knowledge" exception. *See, e.g., Ex parte Lane,* 303 S.W.3d 702, 711-12 (Tex. Crim. App. 2009) (holding that an outside-the-record argument that "people" sell methamphetamine to children, who then become addicts, was designed to arouse the passion and prejudices of the jury and was an improper attempt to persuade the jury to convict a defendant of possession with intent to deliver based on an uncharged offense for which he was not on trial); *Lagrone,* 942 S.W.2d at 619 (holding that an argument that "drugs . . . are a part of prison life" was not a matter of common knowledge); *Freeman,* 340 S.W.3d at 728 (holding that a comment that a defendant "tried with all he could" to "commit the worst criminal act on law enforcement ever in the United States' history," was not a matter of

common knowledge).

However, even if Angelou's life history was not a matter of common knowledge, we find that any error in overruling appellant's objection to this argument was harmless. *See Lagrone,* 942 S.W.2d at 619. "Comments upon matters outside the record, while outside the permissible areas of jury argument, do not appear to raise any unique concerns that would require us to assign constitutional status." *Easley v. State,* 424 S.W.3d 535, 541 (Tex. Crim. App. 2014). Such non-constitutional error must be disregarded if it did not affect the defendant's substantial rights. TEX. R. APP. P. 44.2(b); *Freeman,* 340 S.W.3d at 728; *Brown v. State,* 270 S.W.3d 564, 572-73 (Tex. Crim. App. 2008). In determining whether the substantial rights of the defendant have been affected, we balance the severity of the misconduct (that is, the prejudicial effect), any curative measures, and the certainty of the punishment assessed absent the misconduct. *See Martinez,* 17 S.W.3d at 692-93.

When viewed against the State's argument as a whole, the State's argument that introduced information about Angelou's life was not calculated to deprive appellant of a fair and impartial trial. In addition, this information was not particularly inflammatory or prejudicial. This part of the State's argument took up less than two pages of an eighteen-page final closing argument. Although the trial court did not take curative measures, we have a strong assurance that the jury would have assessed the same punishment if the State had not introduced information about Angelou's life. In light of the other evidence which supported a finding of future dangerousness – including the instant offense and

appellant's history of physically abusing Kametra and his sister – the introduction of this information had no appreciable effect on the jury's decision. *See, e.g., Lagrone,* 942 S.W.2d at 620. Point of error forty-one is overruled.

## CONSTITUTIONAL ISSUES

Appellant raises points of error forty-three through fifty-four under the heading, "Constitutional Issues." These points of error raise various challenges to the constitutionality of Article 37.071, as well as challenges to the trial court's rulings on appellant's pretrial motions to find Article 37.071 unconstitutional. Citing *Saldano,* appellant acknowledges that this Court has rejected these claims in the past. He invites the Court to review its prior decisions and states that he has included these claims in order to preserve them for further review in the federal courts. As appellant acknowledges, we have previously rejected similar claims. *See Saldano,* 232 S.W.3d at 107-08. Appellant presents no new arguments to persuade us to revisit our previous dispositions of these issues. Points of error forty-three through fifty-four are overruled.

We affirm the judgment of the trial court.

Delivered: November 4, 2015
Do Not Publish